CLIFFORD SHOE CO. *vs.* UNITED SHOE MACHINERY CORPORATION.

Suffolk.   January 5, 1937. — March 30, 1937.

Present: RUGG, C.J., PIERCE, DONAHUE, LUMMUS, & QUA, JJ.

*Contract*, Construction, Modification, Waiver, For hiring of machinery. *Pledge*. *Evidence*, Presumptions and burden of proof. *Fire*. *Negligence*, Fire. *Words*, "Fault."

A licensee of machines under a contract in writing, who had made with the licensor a deposit of money as security for the payment of sums to become due under the contract, was not precluded from maintaining, after the termination of the license, an action for repayment of a part of the deposit by the mere fact that accounts between the parties had not been settled, where it appeared that, in a statement of account rendered by the licensor, the amount of the deposit had been credited.

An article in a contract in writing respecting licensing of machines which . in substance required the licensee to pay the licensor for machines destroyed by fire was applicable upon such destruction to the exclusion of a later article requiring the licensee upon termination of the

contract to deliver the machines to the licensor "complete and in good order and condition, reasonable wear and tear alone excepted," and thereupon to make a certain payment to the licensor; and upon the licensor waiving the earlier article he had no right to make a claim under the later one.

Evidence, including admissions by counsel at a trial, warranted a finding that a provision of a contract in writing licensing machines, that the machines should be used only at a specified location, was modified by parol; a clause requiring waiver of any provision to be in writing signed by designated persons, if applicable to modifications, could also be found to have been so modified.

Evidence warranted a finding that a licensee of machines in an old wooden factory had sustained the burden of proving that their destruction by fire had occurred without negligence on his part although the cause of the fire was not shown.

CONTRACT. Writ in the Municipal Court of the City of Boston dated August 5, 1932.

The action was heard three times in the Municipal Court. The second hearing was by *Devlin*, J., and the third hearing by *Carr*, J., both of whom found for the plaintiff in the sum of $1,690.10. The orders of the Appellate Division, from which the defendant appealed, are described in the opinion.

*W. B. Farr*, for the defendant.

*M. C. Taylor*, for the plaintiff.

PIERCE, J. This is an action of contract brought in the Municipal Court of the City of Boston, in which the plaintiff seeks to recover $1,900 "for money had and received by the defendant from the plaintiff for the plaintiff's use." The answer is a general denial. When originally tried, the judge who heard the case found for the plaintiff for the amount claimed.

Subsequently, when the case came before the Appellate Division upon a report of the trial judge and a petition of the defendant to establish the report requested by it, the Appellate Division ordered a new trial. At the second trial the case was heard upon certain admitted facts and oral and documentary evidence. The report of the second trial contains copies of the plaintiff's demand on the defendant to admit certain facts and the defendant's answer thereto, and it also "contains all the evidence material to the ques-

tions reported." The material facts at the second trial are in substance as follows: The plaintiff, a corporation, was in the business of manufacturing shoes, and used in that business certain machinery which it held under lease and license agreements from the defendant. All of the machines covered by these leases were leased formerly to the Empire Shoe Company, in which one Fox, president of the plaintiff company, had been largely interested. Exhibit A is the same lease and license agreement which was before the court at the first trial and before the Appellate Division upon the report from the first trial. Of the $1,900 sought to be recovered from the defendant in this action, $1,400 had been deposited by Fox (now president of the plaintiff) as a guaranty of payment of his individual obligations to the defendant. Subsequently the Empire Shoe Company was formed. This corporation took over the business of Fox, and, by a written agreement between Fox, the Empire Shoe Company and the defendant, the leases of the shoe machinery held by Fox were transferred to the Empire Shoe Company, and the benefit of and the title to the deposit of Fox were vested in that company. The Empire Shoe Company subsequently took leases of additional machinery from the defendant and made an additional deposit of $500, thus making a total guaranty deposit of $1,900. Late in 1930 or early in 1931, the Empire Shoe Company made an assignment for the benefit of its creditors. Its lease and license agreements were terminated by this assignment. Fox, who at that time had formed the plaintiff corporation, secured new leases from the defendant and arranged with the approval of the defendant that the deposit of the Empire Shoe Company should be held by the defendant to guarantee the obligations of the plaintiff. No claim to the deposit is made by Fox or the Empire Shoe Company.

The lease and license agreements between the defendant and the plaintiff provide that the leased machinery should be used "only in the factory now occupied by : . . [the licensee] at Lynn." The plaintiff occupied its factory in Lynn until November, 1931, when it discontinued operation

there. Late in January, 1932, it moved to Gardner, first having requested and secured written permission from the defendant to remove the leased machines to and operate them in the Dunn Building, a large wooden building in the center of Gardner. Because of lack of repairs in the Dunn Building, the machines when they reached Gardner were moved to the Kuniholm Building, a frame building located one and one half miles from the center of the city, upon a side road, with no hydrant very close, but with a fire alarm box seven or eight feet from the front entrance to the building and a river about four hundred feet away. No written notice of such change was given to the defendant, and no written permission therefor was obtained.

Fox testified that, shortly after the removal of the machinery to Gardner, he told one Durrell, an employee of the defendant at its Lynn office, that the plaintiff was in the Kuniholm Building. He also testified that the machinery was installed in the Kuniholm Building late in January, 1932; that the defendant's machines when set up in the Kuniholm Building were adjusted by men sent by the defendant from its Marlborough office; that the defendant shipped merchandise by parcel post to that building; and that the plaintiff was charged for rents for machines for the months of January and February, including the time they were in the Kuniholm Building. In this connection Mr. Farr, the attorney for the defendant, stated that the officers of the defendant in the Lynn and Marlborough offices had "authority to ask . . . [licensees] about their changes in business."

On February 24, 1932, some question having been raised as to the fire insurance coverage on the machines, the plaintiff sent a letter addressed to Durrell of the defendant's Lynn office and reading as follows: "It is my belief that we have a letter from you to the effect that you carry your own fire insurance on these machines. Will you kindly verify this." The defendant wrote, under date of February 26, 1932, as follows: "Replying to your letter of February 24, to the attention of Mr. Durrell, our announce-

ment of June 15, 1923, copy of which is enclosed, provides that, unless or until notice to the contrary shall have been given, the licensee will not be required to pay the amount stated in Column No. 1 of the Schedule of Machines in Form–A leases if the machines are destroyed by fire. This announcement does not waive or modify any other payment or provision of the lease. As the charge for fire loss provided in Article 3 of Form–A leases is waived by our announcement above referred to, it seems to us unnecessary for you to carry fire insurance to indemnify you against such charge." The announcement therein referred to reads as follows: "Destruction of Machines by Fire. Article 3 of the new (Form A) forms of lease provides (among other things) that in case the leased machinery shall be destroyed by fire before redelivery to the United Corporation [the defendant] the licensee shall pay to the United Corporation in respect to each machine so destroyed the sum (if any) set opposite the name of such machine in Column I. in the 'Schedule of Machines'. From and after July 1, 1923, and unless or until announcement to the contrary shall be made, the United Corporation will waive payment under this provision in respect to any machine held by a licensee under such (Form A) forms of lease which shall be destroyed by fire without fault on the part of the licensee."

The defendant's letter was received by the plaintiff on February 27, 1932. Shortly after noon on that day a disastrous fire occurred upon the plaintiff's premises. The building was completely destroyed as were also the machines of the defendant. The remains of the machines covered by the lease and license agreements were dug out of the débris of the building and returned by the defendant to its plant at Beverly a few days after the fire. The plaintiff has not resumed business since the fire, but shortly thereafter assigned its fire insurance policies to Aaron Kobrin, a lawyer of Lynn, to collect the proceeds, pay the creditors of the plaintiff, and to return the surplus to it. All creditors except the defendant have been paid in full, and the surplus has been returned to the plaintiff's stockholders.

The defendant on or about March 24, 1932, sent to Mr. Kobrin a sworn statement of account, claiming the plaintiff was indebted to it, which may be summarized as follows:

| "DEBITS | | CREDITS | |
| --- | --- | --- | --- |
| Merchandise | $119.10 | Interest | $85.93 |
| Transportation expense | 174.50 | Waiver of Royalties | 360.60 |
| Unearned discount | 20.93 | Cash Deposit | 1900.00 |
| Rentals & Royalties | 422.06 | | |
| Deferred License Fees | 3202.00 | | $2346.53 |
| Amounts payable for loss by fire | 8265.00 | | |
| | $12203.59 | | |

leaving a debit balance of $9857.06. As to this account the only items disputed by the plaintiff are 'Deferred License Fees — $3202.00' and the 'amounts payable for loss by fire — $8265.00', and as to these items no question was made as to the amounts."

At the close of the second trial the defendant presented certain requests for rulings which, with the action of the judge thereon, are as follows:

"1. That upon all the evidence the plaintiff is not entitled to recover, (a) Because the 'cash deposit' ($1900) sought to be recovered in this action was pledged with the defendant to secure the payment by the plaintiff of any and all sums due or which might thereafter become due from the plaintiff to the defendant, and there is no evidence which would warrant a finding that at the time of the institution of the action the plaintiff was not indebted to the defendant; (b) Because even if it be assumed that the plaintiff would be entitled to recover any balance resulting from the excess of the amount of the deposit above the indebtedness of the plaintiff to the defendant, it appeared that under the contracts between the plaintiff and the defendant the plaintiff, in addition to other items, was indebted to the defendant in the amount of Nine Thousand and Fifty Dollars ($9050), payable under the provisions of Article 3 of said contracts, as reimbursement to the defendant for the destruction of its leased machines; (c) Because

under the contracts between the plaintiff and the defendant it appeared that the plaintiff was indebted to the defendant, in addition to other items, in the amount of Three Thousand Two Hundred and Two Dollars ($3202) 'deferred license fees,' payable under the provisions of Article 14 of said contracts. 'Denied.'

"2. That in order to be exonerated from the payment for destruction of the machines the plaintiff had the burden of showing that the leased machines were destroyed by fire without fault on the part of the plaintiff. 'Given, but I find the burden sustained.'

"3. That there is no evidence in the case which warrants a finding that the destruction of the leased machines was without fault on the part of the plaintiff. 'Denied.'

"4. That the destruction of the leased machines by fire would not of itself terminate the license agreements under a proper construction thereof. 'Denied — Query — What does "proper construction" mean here?'

"5. That if the defendant offered to the plaintiff to replace the destroyed machines and such offer was refused, the contracts were terminated by the voluntary act of the plaintiff. 'Denied — Based on facts not found.'

"6. That even if it be regarded that the destruction of the machines by fire terminated the lease contracts such a termination was embraced in the provisions of paragraph 14 of the contracts, and upon such termination the plaintiff was obligated to pay the defendant the sum of the 'Deferred License Fees.' 'Denied.'

"7. There is no evidence in the case which warrants a finding that the plaintiff at any time before the institution of the action paid or offered to pay its indebtedness or any portion thereof to the defendant. 'Denied.'

"8. That the removal of the leased machines to the Kuniholm plant and their operation there was in violation of the plaintiff's obligations under the leases. 'Denied — I find it was with defendant's approval and knowledge.'

"9. That the destruction of the defendant's machines by fire at the Kuniholm plant, where the machines were not

permitted to be, constituted destruction by fire by the fault on the part of the plaintiff. 'Denied — See above.'"

The trial judge found generally for the plaintiff in the sum of $1,690.10, and reported to the Appellate Division his action on the defendant's requests for rulings. On October 28, 1935, the Appellate Division ordered a new trial "of the issue whether the fire of February 27, 1932, in which the defendant's machines were destroyed or damaged, occurred without fault of the plaintiff, excluding from that inquiry the location in the Kuniholm Building rather than in the Dunn Building," and directed that "If the fact stated be found in the affirmative, judgment is to be entered upon the finding hitherto made by the trial judge; if in the negative, judgment for the defendant." The defendant appealed from this order.

A third hearing before a judge of the Municipal Court of the City of Boston was then held on the specific issue of the plaintiff's fault in connection with the fire. At the close of this hearing, and before final arguments, the judge denied the defendant's requests for rulings, to the effect that there was no evidence that the fire occurred without fault of the plaintiff; and made the following statement: "The cause was tried in accordance with the order of the Appellate Division. I find that the fire in which the defendant's machines were destroyed or damaged occurred without fault of the plaintiff." He found generally for the plaintiff "in the sum found by the trial judge in the last preceding trial." The defendant being aggrieved by the refusal to rule as requested, the judge reported the case "to the Appellate Division for determination." The "report contains all the evidence material to the questions reported." The report was dismissed by the Appellate Division and the defendant appealed.

A lease and license agreement, the provisions * of which

---

* The provisions covering the covenants of the licensee are summarized as follows:

Article 1 provides that property in the machines shall remain in the licensor, and that the machines will be used only in the licensee's factory at Lynn.

Article 2 provides that the licensee shall keep the leased machinery in good working order.

are representative of all agreements under which the plaintiff held machines of the defendant, was incorporated into the record as an exhibit.   The incorporated lease and license

---

Article 3 reads: "The leased machinery at all times, until redelivered to the United Corporation as hereinafter provided, shall be held at the sole risk of the licensee from injury, loss, or destruction, and in case the same or any thereof shall be destroyed by fire or otherwise before such redelivery the licensee shall pay to the United Corporation in respect to each machine so destroyed the sum (if any) set opposite the name of such machine in column I in the foregoing Schedule of Machines as partial reimbursement to the United Corporation for such destruction, and the licensee shall forthwith return whatever remains of the machinery so destroyed to the United Corporation at Beverly, Massachusetts."

By Article 4 the licensee is to pay any taxes on the machines.

Article 5 states the purposes for which the machines may be used.

Article 6 provides that the licensee shall pay as an initial license fee "the amount (if any) set opposite the name of such machine in column II in the foregoing Schedule of Machines."

Article 7 provides for the payment as monthly rental of the amount set forth in column III of the schedule.

Article 8 provides for the payment of royalties or payments on each article in process of which the machines are used, and refers to columns IV, V, and VI of the schedule.

Article 9 provides that all payments under that lease shall be independent of payments under any other leases.

Article 10 gives the defendant the right to attach indicators to the machines.

Article 11 provides for the keeping of reports of the use of the machines.

Article 12 provides that the lease shall continue for ten years subject to termination by the licensor (A) in case of a breach of covenant, insolvency, etc.; (B) in case of bankruptcy or assignment for the benefit of creditors the lease shall be terminated unless the licensor shall elect otherwise; (C) in case the licensee has surplus machines the licensor can terminate as to those machines.

By Article 13, if upon expiration of the named term of the lease, machinery is not returned and its return not requested, the agreement is extended indefinitely as to term, but either party could thereafter terminate on sixty days' notice in writing.

Article 14 reads: "Upon the termination in any manner whatever of the lease and license hereby granted or any extension thereof in respect to any machine hereby leased the licensee shall forthwith deliver such machine to the United Corporation, at Beverly, Massachusetts, complete and in good order and condition, reasonable wear and tear alone excepted, and shall pay to the United Corporation in respect to each such machine the amount (if any) set opposite the name thereof in column VII in the foregoing Schedule of Machines.   The licensee shall also pay to the United Corporation such sum as may be necessary to cover replacement at the regular prices established by the United Corporation therefor of all broken or missing parts."

By Article 15 the licensor is given the right upon termination to enter and remove machines.

Article 16 relates to the form of notice of termination by the licensor.

Article 17 reads: "None of the conditions or provisions of this agreement shall be held to have been waived by any act or knowledge of the United Corporation, its agents or employees, but only by an instrument in writing, signed by the president, a vice-president, the treasurer or an assistant treasurer of the United Corporation."

Article 18 provides that the name of the licensor includes its successors and assigns, and that the provisions of the lease shall be binding on the licensee's representatives.

By Article 19 prior licenses or leases are superseded.

agreement, after naming the parties, sets forth the names and serial numbers of the machines leased under that particular agreement. Opposite the name of each machine are figures in seven columns, the heading of each column describing the nature of the charge set forth in that column as follows: "I. Payment in case of loss by fire, etc. (See Article 3)"; "II. Initial License Fee (See Article 6)"; "III. Rental (See Article 7)"; "IV. Royalty or per pair payment (See Article 8)"; "V. Monthly payment for use less than minimum (See Article 8)"; "VI. Minimum number of pairs per month (See Article 8)"; "VII. Payment upon expiration or termination (See Article 14)."

The defendant argues (1) that if the plaintiff was indebted to the defendant in any amount, the plaintiff cannot maintain this action to recover the pledged money; (2) that the plaintiff was indebted to the defendant under article 14 of the lease in an amount greater than the amount of the deposit; and (3) that the plaintiff is indebted to the defendant for the destruction of the machines by fire since the plaintiff did not show that the fire occurred without its fault. On this point the defendant contends that the unauthorized removal of the machines to the Kuniholm Building showed negligence on the plaintiff's part.

On the first point the defendant's argument is based on the theory that pledged property cannot be recovered by the pledgor until he has paid or tendered the amount of the debt secured or performed obligations secured. *Reed* v. *Bristol County Realty Co. Inc.* 250 Mass. 284, 287. In the case at bar, however, the defendant rendered to the plaintiff an account in which the cash deposit appeared as a credit to the plaintiff as against indebtedness claimed by the defendant to be owing to it from the plaintiff. The situation appears to resemble more closely a case where, after the pledgee has sold pledged property, the pledgor seeks to recover the surplus to which he is entitled. *Stevens* v. *Bell*, 6 Mass. 339, 343. As thus interpreted the action is maintainable. *Hancock* v. *Franklin Ins. Co.* 114 Mass. 155, 157.

Whether the plaintiff is liable under article 14 of the lease,

for payments under that provision upon the expiration or termination of the lease, depends upon a construction of the whole lease, and particularly article 3, relating to payments for machines damaged by fire, and article 14. It is apparent from a reading of these articles, if interpreted literally, that they conflict with each other. Thus article 3 provides that the licensee shall pay a fixed sum if the machines are destroyed by fire, and shall return the remains of the machines to the licensor. By article 14 the licensee is required upon the termination of the lease to deliver the machines to the licensor "complete and in good order and condition, reasonable wear and tear alone excepted" and to pay the amount set forth in column VII of the schedule of machines. In order to give effect to both provisions article 14 should be interpreted as not applying to cases where machinery is destroyed by fire. The defendant contends that it is unnecessary to hold that the money payment under article 14 is not collectible where machinery is destroyed by fire; that those payments are really deferred license fees which are payable whether or not the machines are destroyed, relying on *In re Diana Shoe Corp.* 80 Fed. (2d) 827, where the matter was discussed. It does not appear from that opinion that the exact clauses here considered were in question there, nor whether any additional evidence was introduced as to what the so called deferred license fees represented. The issue before the court was whether a clause apparently similar to article 14, here under consideration, was unenforceable in bankruptcy as a penalty. It was there said that the provision set a time for payment of part of the consideration for the granting of the lease and license agreement. It was, however, also said upon closer examination of the provision and what it represented, that the clause did not provide for a penalty since the amounts specified in the provision were ". . . not unreasonable compensation for the costs to the appellant of replacing the machines in use after the end of a prior lease" (page 829). In the case at bar the question is whether the fire damage provision within its scope is exclusive of the provision for payment on termination. If, as was said

in the above mentioned case, the provision is really a replacement cost charge, there seems to be no necessity for allowing that part of article 14 relating to payment to apply to cases in which the fire damage provision is applicable, since the latter clause also apparently relates to replacement costs of destroyed machines. As under article 3 of the provisions of the lease a licensee is liable for an amount to compensate for a destruction of machinery by fire, there is no reason to construe part of article 14 as imposing on the licensee an additional charge for deterioration or replacement of the same machines. In the absence of other evidence as to what the payments under article 14 represent, article 3 should be construed to apply exclusively in the event of the destruction of machines by fire, and no part of article 14 is applicable thereto. It follows, therefore, that the plaintiff is not liable for any payments under article 14 of the lease.

The defendant contends that it is for the plaintiff to show that the fire occurred without fault on its part before the waiver of the charge provided for in the event of destruction of machines by fire comes into operation. By the use of the word "fault" it is assumed that the natural legal meaning of the word negligence was intended. See *School District in Medfield* v. *Boston, Hartford & Erie Railroad,* 102 Mass. 552, 554. On this question, at the outset, the defendant argues that negligence of the plaintiff is shown by the fact that it moved the machinery to the Kuniholm Building in Gardner without first having obtained written permission to do so. There was evidence that Durrell of the defendant's Lynn office was told of the change to the Kuniholm Building, that machines were there adjusted by the defendant's employees, that merchandise was sent there, and that rent for the machines covering the period of the plaintiff's occupation of that building was accepted by the defendant. In addition, the defendant's counsel made statements during the course of the trial from which it may be inferred that offices such as the Lynn and Marlborough offices of the defendant corporation had authority to ask licensee "about their changes in business." These

statements were competent evidence. *United Shoe Machinery Co.* v. *Bresnahan Shoe Machinery Co.* 197 Mass. 206, 214. From this evidence it cannot be said that a finding of a modification of the provision of the contract prohibiting the use of the machinery at any place other than in the licensee's factory in Lynn was not warranted. *Freedman* v. *Gordon,* 220 Mass. 324, 326. *Gilman & Son, Inc.* v. *Turner Tanning Machinery Co.* 232 Mass. 573, 575. *Blair* v. *National Reserve Ins. Co.* 293 Mass. 86. The clause in the lease requiring waiver of any provisions to be in writing, if applicable to a modification of the lease, is no bar to such a result, since such a clause also may be modified orally. See 3 Williston, Contracts, § 1828. It follows that modification of the original agreement could have been found on the above stated evidence.

The defendant contends finally that at both trials the plaintiff failed to sustain the burden of proving that the fire occurred without negligence on its part. It is assumed, because of the form of the writing waiving the charge provided for in the event of loss by fire, that the burden of proving the negative was cast on the plaintiff. The evidence for the plaintiff on this point may be summarized as follows: The factory building was an old, large, wooden building consisting of a basement and two floors. A small boiler house or room constructed of masonry adjoined a portion of the basement with which it was connected by a fire door. The basement was used for storage purposes, the portion next to the boiler room containing machinery not in use. Also in the basement were two steel drums set on metal frames and containing lubricating oil. There was nothing near these drums and there were no oily rags there. There were also in the basement some bales of fibre, left by a previous tenant. No new wiring had been installed in the basement nor was gas stored therein. The plaintiff employed a porter who cleaned up the factory each night and dumped the rubbish in a dump one hundred yards from the factory. A "No smoking allowed" rule was strictly enforced throughout the building. Shortly before the fire a fire inspector visited the premises, and found no fault with

the premises except that he told the engineer hired by the plaintiff to get rid of the bales of fibre before the next inspection, which would be in about thirty days. The engineer employed by the plaintiff was recommended by a group of Gardner business men. His conduct was observed and was very satisfactory. On the day of the fire the engineer, who was also a steam fitter, had been installing radiators and pipes in the building. At 11:30 A.M. he banked the larger of the two boilers. At 11:40 A.M. he emptied the contents of the firebox of the smaller boiler into the ashpit so he could make a pipe connection. He did not open the ashpit door or take out any fire or ashes. He then went upstairs and when he left everything was all right. There was no rubbish or oily rags on the floor. He had no idea as to how the fire started. It started about twelve o'clock either in the boiler room or in the basement. After the fire the insurance people who had insured the plaintiff's own machinery and personal property in the amount of $30,000 adjusted the loss for the full amount without delay or difficulty.

In similar cases where a plaintiff had the burden of proving lack of negligence or due care on his part it was said that he could sustain the burden by showing facts from which due care on his part might fairly be inferred, or by showing in all the circumstances an absence of negligence. *Hinckley* v. *Cape Cod Railroad*, 120 Mass. 257, 262. So in proceedings under the workmen's compensation act, an employee who has failed to give requisite notice and who must show that lack of notice did not prejudice the insurer is not required to exhaust the possibilities of prejudice and displace each one, nor is he bound to demonstrate the negative, but is required only to give evidence of facts from which a finding of lack of prejudice is fairly inferable. *Kangas's Case*, 282 Mass. 155, 158. *Hatch's Case*, 290 Mass. 259, 262. In a case the facts of which closely resemble those in the case at bar, where it was material for the plaintiff to show that a fire was accidentally rather than intentionally caused, it was said that it was not necessary to show the exact cause of the fire, but that a finding

that the fire was not intentionally caused could be supported by inferences from facts showing a lack of motive for the setting of a fire. *Slocum* v. *Natural Products Co.* 292 Mass. 455, 456.

In the case at bar, the plaintiff has put in ample evidence of its general care, and it has also adduced evidence that when its engineer left the basement a few minutes before the fire everything was all right. The plaintiff has therefore put in sufficient evidence from which it may be fairly inferred that however the fire occurred, it occurred without negligence of the plaintiff, and the finding of the trial judge is not unsupported by evidence. It follows that the plaintiff is not liable for the charge provided for in case of loss by fire.

*Order dismissing report affirmed.*