WESTINGHOUSE BROADCASTING COMPANY, INC. *vs.* NEW ENGLAND PATRIOTS FOOTBALL CLUB, INC.

Suffolk. June 13, 1980. — June 20, 1980.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Practice, Civil,* Review of interlocutory action, Injunction. *Injunction. Contract,* Option, Performance and breach.

In an action by a radio and television broadcasting company seeking to enjoin a football club from refusing to honor the company's exercise of its option to broadcast the club's games during the 1980 season, a Superior Court judge did not err in denying injunctive relief where findings were warranted that the club had a greater likelihood of success on the merits and that the company would not suffer irreparable harm by the denial of the injunction since its damages, if any, would be susceptible of quantification so that a monetary judgment could serve as adequate compensation. [72-75]

CIVIL ACTION commenced in the Superior Court Department on April 3, 1980.

A prayer for a preliminary injunction was heard by *Adams, J.*

*Charles R. Parrott (Neil P. Motenko & Gilda M. Tuoni* with him) for the plaintiff.

*David M. Olasov* of New York (*Astrid R. Baumgärdner* of New York, with him) for the defendant.

KASS, J. Following the withholding by Westinghouse Broadcasting Company, Inc. (Group W), of $41,750 from scheduled payments to New England Patriots Football Club, Inc. (Club), during the 1978 season for television rights, Group W and the Club resolved their controversy with a letter dated May 9, 1979, amending their underlying agreement (made August 1, 1976) for a license of radio

broadcast and telecast rights.[1] That letter amendment compromised the amount due the Club for 1978. It also set up a schedule of five $40,000 instalment payments for the license, each to be made on the first days of August, September, October, November, and December in 1979, and again in 1980 should Group W exercise its option for the next season. The amendment concluded with the following paragraph: "No adjustments will be made by Westinghouse in the 1979 or 1980 payments. In the event that Westinghouse fails to make timely payments of any instalment due in 1979, there will be no option for the 1980 season."

Group W fumbled on the next play in that its check for the August payment was not made out until August 3, 1979, was not posted until August 8, and was not received by the Patriots until August 9. By letter dated August 6, 1979, the Patriots notified Group W that because of the overdue payment, "[T]he station has lost its option for the 1980 season." The option, contained in § 10 of the underlying license agreement of August 1, 1976, entitled Group W for each of the 1979 and 1980 seasons to renew its exclusive rights to radio broadcasts of all football games played by the Patriots and to television rights of pre-season games. For 1979, the option was exercised and Group W's rights were honored. Only 1980 is in issue.

On January 4, 1980, Group W notified the Club of the exercise of its option for the 1980 season. Counsel for the Club restated the Club's position that the option no longer existed. After what, in the circumstances, may fairly be described as a period of scrimmaging, Group W in April, 1980, brought an action asking that the Club be enjoined from refusing to honor Group W's exercise of its option. A judge of the Superior Court denied a preliminary injunction. Group W petitioned for review to a single justice of

---

[1] The dispute concerned whether Group W was entitled to make reduced payments because fewer pre-season games were available for television than the parties had anticipated.

this court under G. L. c. 231, § 118, first par. While deny-
ing the specific prayers of the petition, the single justice, on
May 22, 1980, ordered an expedited schedule of an in-
terlocutory appeal under the second paragraph of G. L.
c. 231, § 118. See *Packaging Indus. Group, Inc.* v.
*Cheney,* 380 Mass. 609, 610-615 (1980); *Demoulas Super
Mkts., Inc.* v. *Peter's Mkt. Basket, Inc.,* 5 Mass. App. Ct.
750, 752 (1977).

It has been only a little more than a month since the
standard for appellate review of a grant or denial of a pre-
liminary injunction has been restated. *Packaging Indus.
Group, Inc.* v. *Cheney,* 380 Mass. at 615-616. We are to
test whether the trial court abused its discretion by looking
to see if the court applied proper legal standards and, if so,
whether there exists reasonable support for its evaluation of
factual questions. The *Packaging Industries* opinion also
restated the principles which guide whether a preliminary
injunction should issue. This involves a combined evalua-
tion of the moving party's claim of injury and its chance of
success on the merits. *Id.* at 617. In applying that method
of analysis, we must first "appraise the likelihood that
various views of the facts and the law will prevail at trial."
Leubsdorf, The Standard for Preliminary Injunctions, 91
Harv.L.Rev. 525, 541 (1978). Second, we assess the prob-
able harm to each party stemming from the preliminary
resolution of the merits of the case. Having done this, our
task is to choose the alternative that will inflict the least prob-
able irreparable harm. *Id.* The degree to which money
can soothe the injury is a principal indicator of the irrepara-
bility of the harm.

As to the merits, the position of Group W is that the
failure to make the August, 1979, payment on the first of
the month is a breach so trifling as not to excuse the Club
from further performance. *National Mach. & Tool Co.* v.
*Standard Shoe Mach. Co.,* 181 Mass. 275, 279 (1902). See
generally Restatement (Second) of Contracts § 266 (Tent.
Draft No. 8, 1973). For its part, the Club contends that in
light of the recently resolved dispute about Group W's

10 Mass. App. Ct. 70        73

Westinghouse Broadcasting Co., Inc. v. New England Patriots Football Club, Inc.

unilateral withholding of payments for broadcast rights, the phrase in the May 9 letter requiring "timely payments" became a significant term, indeed, and that a failure to make a payment on time was a material default. Each side draws different lessons from the history of their dealings as set forth in affidavits. That history discloses consistently late payments by Group W in the years 1976 through 1978, although without objection to that tardiness by the Club. Group W asks what the fuss is all about and says that the Club is using the late instalment payment in August, 1979, as a pretext for repudiating its contract so as to be free to deal with a competing broadcaster; the Club says that Group W's record of fiscal tardiness makes it obvious that the "timely payments" provision was intended to set a hair trigger mechanism for ending Group W's option to elect a fifth year of broadcast rights.

The Club's position on the merits is at least sufficiently potent so that it has the greater likelihood of success at trial. Generally, conditions for the exercise of an option require a more strict degree of adherence than may be the case in provisions of a bilateral contract. *United States* v. *Corder*, 208 F.2d 411, 413 (9th Cir. 1953). 1 Williston, Contracts § 61D (3d ed. 1957). 1A Corbin, Contracts § 264, at 522-523 (1963). The rationale for the lesser inclination of courts to inquire into the materiality of a breach of an option condition is that an optionee has a unilateral right. See e.g., *Lucey* v. *Hero Intl. Corp.*, 361 Mass. 569, 573-574 (1972). He may choose to compel or not to compel the optionor to a course of performance which intervening facts (e.g., an increase in the value of the optioned rights) may have made unpalatable to the latter. In the circumstances it may not be too much to ask that a person seeking to keep alive and to exercise option rights turn his corners squarely. The cases and authorities which suggest vigorous compliance with the requirements of option conditions, however, tend to deal with flaws in the exercise of an option, e.g., failure to give notice of the exercise of an option on time, *Donovan Motor Car Co.* v. *Niles*, 246 Mass. 106, 107 (1923); failure to offer

the purchase price on exercise of an option, *Hunt* v. *Bassett,* 269 Mass. 298, 302-303 (1929); failure to give written notice and furnish cashier's check, *Epton* v. *CBC Corp.,* 48 Ill. App. 2d 274, 280-287 (1964). Compare *Gerson Realty, Inc.* v. *Casaly,* 2 Mass. App. Ct. 875 (1974) (certified mail notice satisfies requirement of registered mail notice). Indeed, in the context of the exercise of an option, the Supreme Judicial Court has been wont to say, "It is the established rule, both in law and equity, that time is of the essence of an option." *Hunt* v. *Bassett, supra* at 302, and cases cited. When dealing with conditions which keep options open, it is less clear that time is of the essence, although, where the insertion of the time provision follows hard, as it did here, upon a state of quasi-belligerence, it may make "sense for distrustful parties to agree that each must perform punctiliously, or the whole deal is off." *Spartans Indus., Inc.* v. *John Pilling Shoe Co.,* 385 F.2d 495, 500 (1st Cir. 1967).

As to the probable harm to Group W, it is difficult to attach weight to the claims Group W makes for injury to its reputation and credibility should it not make the radio broadcasts of the Club's games this coming season. Whatever is left of the option, it is good for only one more year, and so the blow is likely to fall soon enough.[2] This will be neither the first nor the last time that an entertainer jumps ship and the abandoned broadcaster has survived. For the Club, it would doubtless be unsettling, albeit scarcely causing irreparable harm, if an injunction prevented it from seeing through whatever new arrangements it has made for radio broadcasts. With the prospects of injury from the grant or denial of an injunction in balance, we agree with the motion judge's reluctance "to order the plaintiff and defendant into an uneasy harness." See *Lawless* v. *Melone,* 350 Mass. 440, 443 (1966) (specific performance of a joint venture should not be ordered where history of litigation

---

[2] In an answer to a counterclaim filed by the Club, Group W claims to be aware that the Club has entered into an agreement with CBS Radio for radio broadcast rights.

presaged an unsatisfactory and unworkable arrangement). Should Group W, after trial, turn out to be the injured party, its damages appear to us to be susceptible of quantification, so that a judgment in dollars can serve as adequate compensation.

Referring in the end to the standard of review announced in the beginning, at the preliminary injunction stage an appellate court "will not reverse if there is a supportable legal basis for the [trial] court's action even if, on final analysis, it may prove to be mistaken." *New England Patriots Football Club, Inc.* v. *University of Colo.*, 592 F.2d 1196, 1200 (1st Cir. 1979). *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. at 615-616. We have no difficulty finding such a supportable basis.

*Order denying preliminary*
*injunction affirmed.*