Brassard, J.
I. INTRODUCTION
This case arises from a dispute concerning the plaintiff, Kenneth Goldberg’s (“Goldberg”), entitlement to a commission based upon the sale of property owned by the defendants, Omega Associates (“Omega”) to Toll Brothers (“Toll Brothers”) which occurred in August 2004. After hearing the argument of counsel, and upon careful consideration and review of the record, the plaintiffs motion for a preliminary injunction is DENIED.
II. BACKGROUND
The plaintiff, Kenneth Goldberg, (“Goldberg”) seeks to enjoin Omega Associates (“Omega”) from conveying, in any fashion, five percent (5%) of the total proceeds which Omega has received and will receive from its sale of a parcel of land in Walpole (the “Walpole Property”) to Toll Brothers (“Toll Brothers”), and to enjoin Omega from conveying, in any fashion, its rights under the promissory note from Toll Brothers as a result of the sale. Additionally, Goldberg moves for an order compelling Omega to disclose to Goldberg: (1) the aggregate purchase price of the Walpole Property; (2) whether the promissory note has been conveyed or transferred; (3) the amount received from the sale to date; and (4) the terms and conditions of payment under the note.[1]
The fundamental dispute concerns a Commission Agreement executed by the parties on August 8, 1994, for sale of the Walpole Property. The Commission Agreement and subsequent Amendment provide for a five percent (5%) commission should Goldberg succeed at selling the Walpole Property, with the fee to be paid upon the Settlement Date agreed upon by Omega and Toll Brothers, Inc. (“Toll Brothers”)).[2] In August of 1994, Omega and Toll Brothers entered into an all cash deal, the initial Purchase and Sale Agreement (“P&S”), whereby Toll Brothers was to build upon an estimated 190 lots. As a result, Omega was to receive $40,000.00 per approved and permitted lot for a total of approximately $7,600,000.00. The terms of the P&S established a ninety-day (90-day) period in which Toll Brothers would obtain the requisite permits and approvals from the Town. On June 15, 1995, Toll Brothers submitted a plan to build 185 lots to the Walpole Planning Board for approval and Special Permit. Goldberg asserts, and Omega disputes, Goldberg’s intense involvement in the permitting process. The Planning Board subsequently denied plan approval and activity concerning the deal quieted for a time.
On May 1, 1996, Omega and Toll Brothers executed a Second Addendum to the P&S which required Omega to purchase an additional fifteen acres of land for the price of $1,040,000.00. The additional $1,400,000.00 spent in acquiring the additional acreage would ultimately become part of Toll Brothers financial obligation to Omega. Further, terms of financing changed so that Toll Brothers would make a substantial down payment at settlement and grant a first mortgage, secured by a promissory note, to Omega.
By 1999, there was no final approval from the Planning Board and the relationship between Toll Brothers and Omega had deteriorated. Toll Brothers defaulted under the initial P&S and addenda, which default resulted in litigation.
In late 1999 and early 2000, Omega and Toll Brothers negotiated and ultimately executed a Third Addendum to the initial P&S. The parties dispute Goldberg’s involvement in negotiating the terms of this agreement. In essence, the Third Addendum changed the per lot compensation to Omega from a fixed price to a percentage of the gross sale price of each residence. Omega argues that the Third Addendum changed the purchase price of the Walpole Property dramatically as well as transformed the Omega/Toll Brothers relationship from that of Buyer/Seller to one of sharing profits from the development and sale of homes.[3] Goldberg asserts his material involvement in negotiating the terms of the Third Addendum with Lewis George (“George”) of Omega and Werner Thiessen (“Thiessen”) of Toll Brothers. Ted Pliakas (“Pliakas”), the Rhode Island attorney who served as Omega’s counsel in the transaction, forwarded a third draft of the Agreement of Sale to Omega’s Edward Diehl (“Diehl”), George and Goldberg. Significantly, the fax cover sheet attached to the November 30, 1999, draft included a note recommending that Goldberg discard prior drafts and focus only on the third draft. Further, Pliakas faxed an updated copy of the Third Addendum to Goldberg on January 12, 2000. As before, the relations between Toll Brothers and Omega deteriorated when Toll Brothers defaulted under the Third Addendum. Omega commenced arbitration as per the Third Addendum and eventually negotiated a settlement with Toll Brothers. In August 2004, the 2004 Purchase and Sales Agreement (“2004 P&S”) was structured and executed.
Goldberg maintains that, as late as September 22, 2004, Diehl continued to assure him that he was entitled to commissions concerning the sale of the Walpole property.[4] Based upon belief rather than personal knowledge, Goldberg claims that Omega is a single-purpose entity poised to dispose of assets from the sale of the Walpole Property in order to render the limited partnership judgment proof. Omega, through George, provides details concerning Omega’s assets. Specifically, $7,930,000.00 was paid by wire transfer at closing with the $9,775,000.00 balance in the form of promissory note guaranteed by Toll Brothers’ parent company, Toll Brothers, Inc. (“Toll Brothers, Inc.”), *719 and secured by a mortgage from another Toll entity, Bird Estate Limited Partnership, to Omega. The note is scheduled to be paid in five annual installments, beginning on August 1, 2005. Omega shall receive installments of: $2,125,000.00; $2,040,000.00; $1,955,000.00; $1,870,000.00; and $1,785,000.00, until the note is paid in full in August 2009.[5] Additionally, Omega points to the August 16, 2004, quitclaim deed which provides that the property conveyed excluded several parcels to which Omega retains title. Finally, at oral argument, counsel for Omega advised the court that Omega was amenable to providing notice to Goldberg in the event of future conveyance, transfer or distribution of Walpole Property assets.
III. DISCUSSION
Mass.R.Civ.P. 65, governs the equitable remedy of injunctive relief. Preliminary injunctive relief may be granted upon a demonstration by the moving party that, in the absence of such relief, “it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980), citing Leubsdorf, The Standard for Preliminary Injunctions, 91 Harvard L. Rev. 525, 541 (1978).
The court evaluates the likelihood of the movant’s success on the merits as well as the risk of irreparable harm should injunctive relief be denied. Finally, the court must balance the harm that each party might conceivably suffer in light of probable success on the merits. Id. at 617.
A. GOLDBERG’S LIKELIHOOD OF SUCCESS ON THE MERITS
A long line of Massachusetts cases have addressed and developed the issue of a real estate broker’s entitlement to a commission. The general rule concerning entitlement to a commission from the seller of real estate provides “in the absence of special circumstances, the broker is entitled to a commission if he produces a customer ready, able and willing to buy upon the terms and for the price given the broker by the owner.” Gaynor v. Laverdure, 362 Mass. 828, 832 (1973) (internal quotations omitted). Subsequently, the Supreme Judicial Court determined that a broker earned a commission only in the event that “the purchaser enters into a binding contract with the owner . . . and . . . the purchaser completes the transaction by closing the title in accordance with the provisions of the contract.” Tristram’s Landing, Inc. v. Wait, 367 Mass. 622, 629 (1975). Where tide does not pass as the result of the “wrongful act or interference of the seller,” a broker’s claim to a commission shall be enforced. Id.
Massachusetts courts have also acknowledged the legitimate expectations of brokers, concluding that, “if the broker brings the parties together on mutually acceptable terms he expects a commission for his labor.” Hillis v. Lake, 421 Mass. 537, 546 (1995). In order for a broker to prevail when entitlement to a commission is disputed, he must demonstrate that his efforts to consummate the sale were more than a mere contributing cause. See Kacavas v. Diamond, 303 Mass. 88, 91 (1939), citing John T. Burns & Sons, Inc. v. Hands, 283 Mass. 420, 422 (1933). Rather, the burden is upon the broker to produce sufficient evidence to “justify a finding that the broker’s services were the efficient or effective means of bringing about the actual sale.” Kacavas, 303 Mass. at 92. Finally, recovery of a broker’s commission may be premised upon “a purpose on the part of the [seller] to obtain without payment a profit from the [broker’s] exertions . . . when the broker has performed all he has undertaken, or is plainly or evidently approaching success . . .” Bump v. Robbins, 24 Mass.App.Ct. 296, 307 (1987), citing Bonin v. Chestnut Hill Towers Realty Corp., 392 Mass. 58, 70 (1984).
The written Commission Agreement and subsequent Amendment executed in August 1994, provides for payment of a five percent (5%) commission to Goldberg should he succeed at selling the Walpole Property. Goldberg contends, and the Amendment states, that the fee owed Goldberg shall be paid at the Settlement provided for in the agreement between Omega and Toll Brothers. By affidavit, George states that Goldberg approached Omega in or around 1994, and presented Toll Brothers as a potential purchaser for the Walpole Property. In this case, Toll Brothers entered into the initial P&S and First Addendum on August 16, 1994, whereby the initial P&S would terminate within ten days of denial of Toll Brothers’ application for Plan Approval and Special Permit, or an appeal from such a denial. From that point forward, Goldberg asserts that he was heavily involved with moving the deal forward through the process of permitting and approval of the plans. Based upon the submission of facsimile transmissions from Pliakas to Diehl, George and Goldberg in December of 1999 and January of 2000, a jury could find that Goldberg had presented a buyer ready and willing to complete the transaction and that his efforts to consummate the sale were more than a mere contributing cause. In consideration of the affidavits of both Goldberg and George, the finder of fact could reasonably infer that Goldberg was an efficient or predominant cause of the sale where he produced Toll Brothers in the first instance, even though he may not have been personally involved in the entirety of the negotiations that resulted in consummation of the sale. See Kacavas v. Diamond, 303 Mass. 88, 91 (1939) (where negotiations have come to a bona fide end, and abandoned by the buyer and seller, the broker is merely a contributing cause to subsequent sale to original buyer).
Over the protracted course of the parties’ involvement with Toll Brothers, certain terms and conditions changed. George maintains that the restructuring of the initial P&S changed the terms of the deal so as to *720 break the causal relationship between Goldberg’s efforts and the 2004 sale. However, the terms originally proposed and those that ultimately bind the buyer and seller need not be identical for a broker to support his position as am efficient or effective cause of the eventual sale. Id. (new forces enter to break the causal relationship between broker’s efforts and sale where his contract is terminated and another broker consummates the sale). In addition, the lapse of years between execution of the initial P&S and the transfer of title of the Walpole Property is not fatal to Goldberg’s claim that, as the efficient cause of the sale, he is entitled to the agreed upon commission. See Chisholm v. McCarthy, 325 Mass. 72, 74 (1949) (in the absence of revocation of broker’s authority, lapse of time did not alter finding that broker was effective cause of sale). Finally, it is reasonable to infer that no revocation had taken place where George proposed a discounted commission as late as September of 2004.
In conclusion, the written Commission Agreement, the complexity of the deal and the communications between the parties support Goldberg’s likelihood of success on the merits of his claim.
B. GOLDBERG’S RISK OF IRREPARABLE HARM
The court must make a “reasonable assessment of the risk of irreparable harm to either party as a result of the issuance or denial of the injunction.” Boston Athletic Association v. International Marathons, Inc., 392 Mass. 356, 362 (1984). As a general rule, monetary loss is not considered irreparable harm unless “the loss threatens the very existence of the movant’s business.” Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Company, 399 Mass. 640, 643 (1987), citing Wisconsin Gas Company v. Federal Regulatory Energy Commission, 758 F. 2d 669, 674 (D.C.Cir. 1985). Such relief may be proper where there is a risk that funds generated by a contract between the parties would be disposed of prior to a hearing on the merits. Id. (where assessment of damages would be both arduous and time consuming) . In the absence of assurances that the defendant would be able to pay a judgment, a preliminaiy injunction may be granted when necessary to protect a plaintiffs damages remedy. Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 53 (1st Cir. 1986). A defendant’s insolvency coupled with the fact that “its funds were in danger of depletion” have been determined to be a risk of harm sufficient to “preserve the status quo pending final determination . . .” Id. at 53. See also St. Paul Fire & Marine Insurance Co. v. Ellis & Ellis, 951 F.Sup. 5 (D.Mass. 1996). “The degree to which money damages can soothe the injuiy is a principal indicator of the irreparability of the harm.” Westinghouse Broadcasting Company, Inc. v. New England Patriots Football club, Inc., 10 Mass.App.Ct. 70, 72 (1980).
In this case, Goldberg seeks a preliminaiy injunction as security for his claim that he is entitled to a commission. Acknowledging that money damages generally constitute a remedy at law, Goldberg asserts that there is a substantial risk that Omega will render itself judgment proof, leaving Goldberg with no remedy at all. Goldberg claims that Omega, an LLP, and its general partner, Neponset, are both single-purpose entities, that purpose being to convey the Walpole Property. Indeed, should Goldberg prevail on the merits of this case, he stands to recover a substantial sum of money as a result of his efforts concerning the sale of the Walpole Property. However, there is no indication in this case that either Omega, or its general partner, Neponset, are insolvent or winding down so as to threaten Goldberg’s damage recoveiy should he prevail at a trial on the merits. Rather, Omega has provided assurance to Goldberg and to this court that there exists a solid financial basis to pay the damages in the event Goldberg succeeds. Omega retains an ownership interest in other properties in the Commonwealth. In addition, Omega holds a promissoiy note in excess of $9,000,000.00, from Toll Brothers, Inc., a national corporation. There is a steady income stream as a result of the sale of the Walpole Properly extending until the year 2009. Further, Omega has agreed that it will provide reasonable notice to Goldberg and his counsel prior to a future conveyance, transfer or distribution of the properties or assets at issue. Finally, Goldberg has failed to establish that denial of an injunction threatens the veiy existence of his business. The denial of a preliminaiy injunction will not cause irreparable harm to Goldberg while the case proceeds to a hearing on the merits.
ORDER
For all of the foregoing reasons, the plaintiff s motion for preliminary injunction is DENIED.

The parties have been, and are, operating under a stipulation dated December 17, 2004, whereby Omega represents: (1) it has received $7,930,000.00 in gross proceeds from the sale of the Walpole Property; (2) Omega shall not transfer, dissipate, waste, distribute, or otherwise convey $396,000.00 of the proceeds until this court reaches a decision or upon further stipulation; (3) Omega shall not convey five percent (5%) of all future payments it will receive from Toll Brothers, to a total of $885,250.00, as with (2) above; and (4) Omega has not and shall not convey or encumber the Promissory Note until decision of this court or upon further stipulation.

The Amendment precludes Goldberg from marketing other properties owned by Omega not at issue.

Base price for a lot increased to $45,000.00, and Omega was also to receive a percentage of gross sales price of homes built, plus $500,000.00. Based upon the plan of 198 lots, the overall purchase price increased from $7,600,000.00 under the Initial P&S to approximately $17,700,000.00.

Goldberg’s January 24, 2005, affidavit further provides that Diehl offered a discounted commission in the amount of $350,000.00 because Omega had incurred significant litigation expenses.

The note does not bear interest. In the event of default, a default interest rate shall apply.