Gary J. BACHORZ and Carmelo A. Scuderi, Plaintiffs

v.

Shauna MILLER–FORSLUND, Executrix of the Estate of Nairn L. Miller, Defendant.

C.A. No. 09–cv–30132–MAP.

United States District Court, D. Massachusetts.

Sept. 22, 2011.

Mark J. Albano, Dalsey, Ferrara & Albano, Springfield, MA, for Plaintiffs.

David H. Rich, Todd & Weld, George James Kossuth, Todd & Weld LLP, Boston, MA, for Defendant.

***MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT*** (Dkt. Nos. 26 & 31)

PONSOR, Senior District Judge.

## I.  INTRODUCTION

Plaintiffs Gary J. Bachorz and Carmelo A. Scuderi seek specific performance of an option to purchase a commercial property that they had leased from their now deceased landlord Nairn L. Miller to operate their autobody shop. Miller's daughter, Defendant Shauna Miller–Forslund, who inherited his estate, contends that Plaintiffs were in default of their obligations under the lease when they attempted to exercise the option to purchase in May 2009, thus relieving Defendant of her obligation to sell the property. Defendant has brought counterclaims for breach of contract, declaratory judgment, and violation of Mass. Gen. Laws ch. 93A. Defendant has filed a motion for summary judgment (Dkt. No. 26), and Plaintiffs have filed a motion for partial summary judgment (Dkt. No. 31). For the reasons stated below, Defendant's motion will be denied and Plaintiffs' motion will be allowed.

## II.  FACTS [1]

### A.  The Lease.

Plaintiffs Gary J. Bachorz and Carmelo A. Scuderi own Berkshire Auto & Truck, Inc., an automotive repair business, which they operate on property owned by Nairn L. Miller ("Miller" or "Landlord"), located at 850 Berkshire Avenue, Indian Orchard, in Springfield, Massachusetts ("the Premises"). On February 12, 1996, Plaintiffs entered into a fifteen-year lease ("the Lease") running from March 1, 1996, until March 1, 2011. The Lease was between Plaintiffs personally and Miller doing business as Nairn Realty Ltd.

The Lease provided Plaintiffs with an option to purchase the Premises, which reads in pertinent part:

> The Tenants shall have an option to purchase the real estate as described in Article 1.01 for the sum of One Hundred Seventy–Five Thousand ($175,000.00) Dollars to be exercised during the term of this lease by instrument in writing directed to the Landlord at its designat-

---

**1.** Defense counsel contends that Plaintiffs have failed to file a response to Defendant's statement of material facts, in violation of Fed.R.Civ.P. 56(c)(1) (requiring parties to identify specific parts of the record supporting their position or "show[ ] that the materials cited [by the adverse party] do not estab-lish the absence or presence of a genuine dispute"). However, Plaintiffs filed their own statement of material facts (Dkt. No. 32), which, in conjunction with oral argument and the parties' briefs, has proved sufficient to alert the court to which facts are in dispute.

ed address provided that the Tenants shall not then be in default in the payment of rent or any of the other terms and conditions hereof.

(Dkt. No. 29, Ex. 1, Art. XVII, § 17.01.) The option further provides that a percentage of Plaintiffs' rental payments will be credited against the purchase price if they exercise the option.

Plaintiffs assert that they had originally intended to purchase the property from Miller in 1996, but Miller convinced them to enter into this lease agreement so that he could avoid paying a substantial capital gains tax on the property at that time. In support of this assertion, Plaintiffs note that they paid for a structural inspection of the building and secured a $200,000 mortgage commitment prior to signing the Lease.

## B. *Disagreements Arise.*

Plaintiffs allege that the roof of their repair shop, which was warranted for ten years under Section 4.04 of the Lease, leaked every year from 1996 until May 2002.[2] They maintain that this leak interfered with their business operation by, for example, shorting out a radio and an alarm system. Defendant disputes this allegation, claiming that Miller fully complied with his obligations to repair the roof whenever Plaintiffs requested him to do so.

On May 13, 2002, Plaintiffs' counsel (at the time, Attorney Steven L. Winniman) sent a letter notifying Miller of the damages, estimated to be in excess of $15,000, and observing that Miller's attempts to fix the roof had failed. (Dkt. No. 32, Ex. 6.) Attorney Winniman demanded that Miller comply with his roof repair obligations under Section 4.04 of the Lease and stated that his clients would be withholding rent until he complied.

On May 22, 2002, Miller responded by letter stating that "repairs have been made as expeditiously as possible" and that Plaintiffs appeared to be demanding a new roof, which was "not an option." (Dkt. No. 32, Ex. 7.) He also notified Plaintiffs that they were in violation of Section 6.01 of the Lease, which reads:

> Tenants will not assign the Lease in whole or in part, nor sublet all or any part of the Leased Premises, without the prior written consent of the Landlord in each instance. Such consent will not be unreasonably withheld.

(Dkt. No. 29, Ex. 1.)[3]

Several months prior, in early 2002, Plaintiffs began subletting the Premises without Miller's written consent. From February through April 2002, Plaintiffs sublet the Premises to Berkshire RV Rental, Inc., owned by a man named Peter Cowles. The business ended after Mr. Cowles's death in April 2002. In early 2002, Plaintiffs also sublet the Premises to an individual named Matt Kochanowski, who ran an unlicensed dog food sales operation in which Kochanowski would "bring in damaged bags [of dog food] and sell them at a deep discount." (Dkt. No. 29, Ex. 4, Scuderi Dep. 31:10–15.) Kochanowski did not pay rent, but he did give a percentage of his sales to Plaintiffs. Plaintiffs admit that neither of these subleases were memorialized in a written agreement, nor did they occur with the written consent of Miller.

---

**2.** Section 4.04 reads: "Landlord warrants the good condition and repair of the roof of the premises for a period of ten (10) years from the date of this Lease, and agrees to be re-sponsible for any necessary repairs thereto." (Dkt. No. 29, Ex. 1.)

**3.** The letter also demanded $90 for late rental payments. (*See* Dkt. No. 32, Ex. 7.)

Plaintiffs, however, claim that Miller repeatedly encouraged them to sublet the Premises, although never in writing. According to Plaintiff Bachorz, Miller told them at the signing of the Lease that the Premises were large and that they should consider finding a subtenant:

[I]t was a big building, and [Miller] was telling us that we should utilize the whole building. We should, you know, maybe get a tenant.

(Dkt. No. 32, Ex. 3, Bachorz Dep. 45:8–10.)

In addition, Plaintiffs contend that Miller was aware of various subtenants, including Kochanowski, Berkshire RV Rental, Berkshire Auto & Truck, Inc. (Plaintiffs' own company, which subleased the Premises from Plaintiffs individually), and Miller himself, who maintained an office on the Premises. Miller never objected to these subtenants and did not require Plaintiffs to obtain his written consent before allowing these subtenants to operate on the Premises.

### C. *A Compromise is Reached.*

According to Plaintiff Bachorz, Miller approached Plaintiffs and told them that he "[didn't] want to pay for something that he's not going to own. So he says, 'you guys should pay for the roof because you're going to own the building.'" (Dkt. No. 32, Ex. 3, Bachorz Dep. 139:22–24.) Miller then made the following proposition, as related by Plaintiff Bachorz at his deposition:

[Miller] says, "Plain and simple, I am not going to fix the roof.... You owe me some back rent.... I know what you are doing." He says, "You pay for the roof." At the bottom of [Miller's May 22, 2002] letter, it had something about no written agreement for a subtenancy. He says, "I am not worried about that if you take care of the roof. You make the

roof bill go away and I am not going to worry about it."

(Dkt. No. 32, Ex. 3, Bachorz Dep. 140:21–141:6.) Plaintiff Scuderi recalled a similar exchange:

[Miller] sends us a letter saying that we are in default because of a subtenant, and basically we say, "What do you want us to do, Nairn? Do you want us not to have a tenant?" And he basically says, "Look, I don't want to spend money on replacing this roof. You guys are going to own this place. You take care of it because you are going to get the money back. If you back off the roof, don't worry about the letter."

(Dkt. No. 28, Def.'s Statement of Material Facts ¶ 47 (quoting Scuderi Dep. 50:3–19).) Plaintiffs then replaced the roof at their own expense, which totaled $22,400.

### D. *Exercising the Option to Purchase.*

From 2002 forward, Miller did not maintain an office on the Premises and visited infrequently. He stopped visiting altogether when he left Massachusetts in 2005. Between the end of 2002 and the beginning of 2006, there were no subtenants on the Premises.

Beginning in 2006, Plaintiffs sublet a portion of the Premises to an entity called Tri–Lift, Inc. ("Tri–Lift"), which Plaintiff Bachorz described as "a forklift company." (Dkt. No. 32, Ex. 3, Bachorz Dep. 82:1.) Tri–Lift has been a subtenant continuously since 2006 and pays Plaintiffs $500 per month to use and occupy the Premises. It is undisputed that Plaintiffs did not notify Miller about this sublease, nor did they obtain his written consent.

On April 29, 2009, Defendant's counsel sent a letter to Plaintiffs notifying them that they were in default on the Lease for, among other things, subletting a portion of the Premises without the Land-

lord's prior written consent.[4] (Dkt. No. 29, Ex. 8.) The other alleged defaults involved improvements Plaintiffs made to the Premises throughout the term of the Lease, including painting, paving, removing underground tanks, and installing garage doors. Plaintiffs assert that they received Miller's oral permission for each of these alterations:

> When we did the paving, the doors, any improvements to the building, [Miller] said, "You guys are improving the building. This is going to be your retirement." ... He said, "you are setting yourself up. You are doing a good job."

(Dkt. No. 32, Ex. 3, Bachorz Dep. 147:17–22.) Defendant contends that these alterations, which also included the installation of signs and a new heater, violated the Lease.

Furthermore, Defendant alleges that Plaintiffs have been cited for violating municipal ordinances (also a breach of the Lease) for installing signs without a permit, failing to plant shrubs as a buffer between the pavement and the tree belt, and failing to pay excise tax. Finally, Defendant asserts that Plaintiffs falsely applied as the owner of the property to receive permits for these alterations.

On May 28, 2009, Plaintiffs sent a letter to Defendant providing notification that they intended to exercise their option to purchase the Premises. (Dkt. No. 29, Ex. 9.) There is no dispute that the letter of intent was timely. However, Defendant refused to allow Plaintiffs to exercise the option because of their alleged defaults under the Lease. Plaintiffs subsequently filed this lawsuit seeking specific performance of the purchase option, and Defendant filed a counterclaim against Plaintiffs for breach of contract, declaratory judgment, and violation of Mass. Gen. Laws ch. 93A.

## III. DISCUSSION

### A. The Summary Judgment Standard.

It is well established that "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). The non-movant cannot rest upon mere allegations; rather, he must set forth "specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *see also* D. Mass. R. 56.1 (requiring that a non-moving party's opposition to a motion for summary judgment include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation").

### B. Motions for Summary Judgment (Dkt. Nos. 26 & 31).

The central issue is whether Plaintiffs' alleged defaults invalidated their attempted exercise of the option to purchase on May 28, 2009. For the reasons that follow, this court finds that the alleged defaults did not prevent Plaintiffs from validly exercising the option on that date.

As a threshold matter, Plaintiffs assert incorrectly that the issue of default turns on whether Plaintiffs received notice of default and whether they cured the default

---

4. The letter also alleges that Plaintiffs owe back rent of $120 and that Defendant refused to cash two checks in the amount of $2510.12 because they were labeled "mortgage" payments. However, the parties do not discuss these alleged defaults in their briefs, and the court will not consider them in this memorandum.

within thirty days of receiving such notice. In support of this conclusion, Plaintiffs rely on Section 9.01, the Lease's default provision, which reads in pertinent part:

[Upon] any failure to commence and diligently pursue the performance of any other of the terms, conditions or covenants of this lease to be observed or performed by Tenants for more than thirty (30) days after written notice of such default shall have been mailed to Tenants ... then Landlord ... shall have immediate right of re-entry and may remove all persons....

(Dkt. No. 29, Ex. 1.) As Defendant correctly notes, this provision does not purport to define and limit defaults generally only to those which continue beyond a thirty-day curative period. Rather, it limits the definition of default within a specific context: when a default triggers the landlord's right of re-entry. Consequently, in this case it is irrelevant when Plaintiffs received notice of default.

The sole inquiry here is whether Plaintiffs were, in fact, in default of their obligations under the Lease when they sought to exercise the option on May 28, 2009. The record indisputably demonstrates that Plaintiffs were not in default because (1) Miller waived his right to demand written consent before Plaintiffs sublet the Premises; and (2) the alleged violations of the Lease were too insignificant to justify extinguishing Plaintiffs' option to purchase.

### 1. *Waiver.*

"Waiver is the intentional relinquishment of a known right." *Niagara Fire Ins. Co. v. Lowell Trucking Corp.,* 316 Mass. 652, 56 N.E.2d 28, 31 (1944). Waiver can be either express or implied. *KACT, Inc. v. Rubin,* 62 Mass.App.Ct. 689, 819 N.E.2d 610, 616 (2004). Waiver may be inferred from a party's conduct "where the conduct is consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible." *Id.* (citation omitted). "[W]here waiver is not explicit, it must be premised on clear, decisive and unequivocal conduct." *Id.* (citation omitted). Although waiver is generally a question of fact, the issue can be decided on summary judgment where the facts material to waiver are undisputed " 'and only one possible inference may arise from those facts.' " *Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc.,* 444 Mass. 768, 831 N.E.2d 875, 880 (2005) (quoting *Central Ill. Pub. Serv. Co. v. Atlas Minerals, Inc.,* 965 F.Supp. 1162, 1174 (C.D.Ill.1997)).

Here, the principal default charged by Defendant is Plaintiffs' failure to secure Miller's written consent before subletting the Premises, in violation of Section 6.01 of the Lease. The undisputed facts make clear, however, that Miller waived this right both by his conduct and by express statements to that effect.

To begin with, Plaintiffs assert that Miller was aware of various subtenants and not only permitted the arrangements despite Plaintiffs' failure to secure his prior written consent, but also encouraged them. (*See* Dkt. No. 32, Ex. 3, Bachorz Dep. 87:16–19.) Plaintiffs note that Miller was aware that Plaintiffs' own business, Berkshire Auto, was technically acting as their subtenant and would provide them with monthly rent payments, which they would forward to Miller. Plaintiffs assert that Miller also clearly knew about the sublease to Berkshire RV Rental, because he agreed to clear out his office on the Premises to make room for Berkshire RV in 2002. Moreover, Miller himself acted in effect as a subtenant by maintaining an office on the Premises. Lastly, Plaintiff Bachorz testified that he informed Miller about Kochanowski's dog food operation,

and Miller did not object. (Dkt. No. 32, Ex. 3, Bachorz Dep. 63:20–64:7.) Each of these instances reinforces Plaintiffs' claim that Miller intentionally relinquished his right to demand prior written consent if they chose to sublet the Premises. None of these facts is challenged by Defendant by reference to contrary or conflicting evidence of record.

In addition, Miller obviously continued to accept Plaintiffs' rent payments, despite his knowledge of these violations. Acceptance of rent under such circumstances without a reservation of rights constitutes waiver. *See Tage II Corp. v. Ducas (U.S.) Realty Corp.*, 17 Mass.App.Ct.664, 461 N.E.2d 1222, 1224 (1984) ("[T]he receipt of rent after breach of a lease is a waiver of the breach if received with knowledge of the breach and without reservation.").

Even more significant than Miller's actions were his words. After noting in a letter dated May 22, 2002, that Plaintiffs were violating the lease by subletting the Premises without his prior written consent, Miller met with Plaintiffs and told them, "I am not worried about that [letter] if you take care of the roof. You make the roof bill go away and I am not going to worry about it." (Dkt. No. 32, Ex. 3, Bachorz Dep. 140:21–141:6.) Plaintiff Scuderi's recollection of the conversation was in all material respects identical. (*See* Dkt. No. 28, Def.'s Stat. Mat. Facts ¶ 47.) These facts are undisputed, as Miller, now deceased, cannot contradict these accounts, and Defendant has offered no other contrary evidence.

Given the above, the court finds that Miller waived his right to demand written consent prior to Plaintiffs subletting the Premises. Miller's actions—specifically, his knowledge of the existence of multiple subtenants and his repeated failure to demand prior written consent—evidences a clear intent not to enforce Section 6.01 of the Lease. Moreover, when disputes arose concerning the leaky roof, Miller expressly waived his rights under Section 6.01, hoping to induce Plaintiffs into dealing with the roof themselves, which they ultimately did at significant expense.

Defendant, unable to put forth any contrary evidence, offers several arguments as to why Miller's words and actions cannot legally constitute waiver. None is persuasive.

First, Defendant emphasizes that the Lease contains a clause prohibiting a waiver of any Lease conditions. (*See* Dkt. No. 29, Ex. 1, § 14.01 ("The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained.").) However, such anti-waiver clauses are "relevant but not dispositive." *M.J.G. Properties, Inc. v. Hurley*, 27 Mass.App. Ct. 250, 537 N.E.2d 165, 167 (1989). "[T]here is substantial authority against giving literal and full effect to such clauses; they, too, may be waived." *Id.* at 166 (upholding trial court's finding of waiver despite existence of anti-waiver clause). Given the clarity and multiplicity of Miller's actions, as well as his express intention to waive his rights under Section 6.01, this court holds that the Lease's anti-waiver clause does not preclude a finding of waiver in this case.

Next, Defendant argues that the conversation relied on by Plaintiffs (in which Miller waived his rights under Section 6.01 to induce Plaintiffs to fix the roof themselves) constituted an invalid modification of the Lease. Defendant points out that both the statute of frauds and the Lease itself require that any subsequent amendments be reduced to writing. *See* Mass. Gen. Laws ch. 259, § 1 ("No action shall be

brought ... [u]pon an agreement that is not to be performed within one year from the making thereof ... [u]nless the promise, contract or agreement upon which such action is brought ... is in writing."); (Dkt. No. 29, Ex. 1, Art. XVII, § 14.03 ("[N]o subsequent alteration, amendment, change or addition to this Lease shall be binding upon the Landlord or the Tenants unless reduced to writing and signed by them.").)

The argument ignores the well established principle that certain actions, although not sufficient to constitute a valid contract modification, may still represent a waiver of rights. *See* Mass. Gen. Laws ch. 106, § 2A–208(3) ("Although an attempt at modification or rescission does not satisfy the requirements of [this statute], it may operate as a waiver.").

■ Defendant also asserts that if Miller's words and actions did constitute a waiver, they waived only conditions with respect to the tenancy, not the option to purchase. It is true, as Defendant suggests, that generally "a waiver of the conditions with respect to the tenancy will not be a waiver of the conditions for the option unless the lessor makes a separate waiver of those conditions." *Pear v. Davenport*, 67 Mass.App.Ct. 239, 853 N.E.2d 206, 209 (2006); *see also Danvers–DCH, Inc. v. Hill*, No. 052974BLS, 2007 WL 1302607, at *5 (Mass.Super. Mar. 5, 2007) (holding that landlord's waiver for purposes of lease extension did not constitute waiver for purposes of option to purchase, where landlord's attorney issued letter stating that the lease extension "is not to be construed as a waiver of the Landlord's assertion that a default currently exists").

Here, however, the undisputed facts of record make it clear that Miller was explicitly contemplating the option to purchase at the time of the waiver. According to Plaintiff Scuderi, Miller stated,

> "Look, I don't want to spend money on replacing this roof. You guys are going to own this place. You take care of it because you are going to get the money back. If you back off the roof, don't worry about the letter."

(Dkt. No. 28, Def.'s Stat. Mat. Facts ¶ 47 (quoting Scuderi Dep. 50:3–19).) Thus, Miller not only acknowledged Plaintiffs' intention to exercise the purchase option, but he also made it clear that he would not be objecting to the purchase on these grounds. Without question, then, Miller's waiver of rights under Section 6.01 extended to the option to purchase.

Finally, Defendant argues that Miller's waiver, if valid, did not extend to Plaintiffs' sublease to Tri–Lift. As noted above, Plaintiffs began subletting the Premises to Tri–Lift in 2006 without Miller's knowledge or written consent and continue to do so to this day. Defendant posits that Miller waived only his rights as to present subtenants, known to him at that time (2002), not to future subtenants. Plaintiffs respond by pointing to another account of Miller's proposed compromise, contained in Plaintiffs' supplemental answers to interrogatories:

> He said at that [time] words to the effect that "The place will be yours soon. I don't want to pay anything else for maintenance. If you pay for the roof, I will not raise any issue about present or future subtenants."

(Dkt. No. 32, Ex. 5, Pls.' Supp. Answ. Int. at 2.) At the hearing on these motions, Defendant's counsel asserted that this supplemental statement constituted an improper amendment to Plaintiffs' deposition testimony and should be disregarded by the court. To the contrary, this document was signed by Plaintiffs on June 1, 2010, *prior* to their August depositions.

Even if the court disregarded the supplemental response with the "present or future subtenants" language, Defendant's argument would fail. Both Plaintiffs testified in their depositions that Miller told them that if they paid for the roof then they would not have to worry about "that letter," referencing his letter dated May 22, 2002, in which he informed Plaintiffs' attorney that they were "in default on Section 6.01 for subletting part of the Premises without prior written consent of Landlord." (Dkt. No. 32, Ex. 7.) In the May 22 letter, Miller was not objecting to a specific individual or entity occupying the Premises. Rather, he was highlighting his rights generally under Section 6.01 of the Lease to demand that Plaintiffs obtain his prior written consent before subletting the Premises. Consequently, when he waived that right, he waived it generally, including with respect to the sublease to Tri–Lift.

In sum, none of Defendant's arguments is sufficient to overcome the undisputed fact that Miller clearly and unequivocally waived his rights to demand prior written consent under Section 6.01 of the Lease.

### 2. *Strict Compliance with Default Provisions.*

■ It is worth noting at the outset that, had the option clause not expressly conditioned exercise on the absence of default, the current dispute would be easily resolved in Plaintiffs' favor. *See Leisure Sports Inv. Corp. v. Riverside Ent., Inc.*, 7 Mass.App.Ct. 489, 388 N.E.2d 719, 722 (1979) (holding that where there is no express condition in a lease that in order to exercise an option a lessee cannot be in default, the option to purchase could be exercised despite an asserted breach). Likewise, had Miller attempted to terminate the lease agreement as a result of such defaults, the result would be the same. *See DiBella v. Fiumara*, 63 Mass. App.Ct. 640, 828 N.E.2d 534, 538 (2005) ("If the breach is insignificant or accidental, even if there is a default clause, our courts will not allow termination [of the lease]."). This case, however, involves a subtly different issue, as Plaintiffs here seek to exercise a purchase option expressly conditioned upon the absence of default. Still, for reasons that follow, Plaintiffs have the stronger argument.

Plaintiffs contend that the alleged breaches were inconsequential and, therefore, should not prevent the exercise of the option. Defendant counters that purchase options must be strictly construed and any violation, no matter how trivial, must result in forfeiture. For support, Defendant relies heavily on *Pear v. Davenport*, 67 Mass.App.Ct. 239, 853 N.E.2d 206 (2006).

In *Pear*, a commercial tenant sought to exercise an option to purchase the property, and the landlord refused, noting that the option was contingent upon the tenant "compl[ying] with all provisions of the lease." *Id.* at 207. The landlord argued that the tenant had defaulted on at least fifty occasions by failing to pay rent in a timely fashion. In finding for the landlord, the appeals court observed that Massachusetts courts take a "strict view" of options:

> "Generally, conditions for the exercise of an option require a more strict degree of adherence than may be the case in provisions of a bilateral contract.... [A] person seeking to keep alive and to exercise option rights [must] turn his corners squarely."

*Id.* at 210 (quoting *Westinghouse Bdcst. Co. v. New England Patriots Football Club, Inc.*, 10 Mass.App.Ct. 70, 406 N.E.2d 399 (1980)). Consequently, the court held that the tenant's repeated failure to pay rent on time constituted a violation of a

condition precedent to the purchase option and thus precluded its exercise. *Id.*

Plaintiffs, for their part, rely on *Trinity Realty I, LLC v. Chazumba, LLC*, 77 Mass.App.Ct. 911, 931 N.E.2d 510 (2010) ("*Trinity*"). In *Trinity*, a commercial tenant attempted to exercise an option to extend the lease for an additional five years. The option required that the tenant "not be in default in the performance, fulfillment or observance of any of the terms or provisions of this lease" as of the date of exercise. *Id.* at 511–12. Citing *Pear*, the landlord argued that the tenant had not strictly complied with the terms of the lease (*i.e.*, had defaulted) because it was in arrears in transmitting gross sales reports. Additionally, the tenant had allowed a sister company to keep supplies in a basement storage area, despite a provision limiting the use of the area to the tenant's own supplies. The trial court rejected the landlord's argument, finding these so-called defaults to be "inconsequential and immaterial" rather than "significant or prejudicial." *Id.* at 512.

The appeals court upheld the decision, distinguishing *Pear* as follows:

> We recognize that Massachusetts takes a "strict" view of options, and that a tenant's noncompliance with lease terms may result in its losing the privilege of exercising an option even if the same noncompliance would not warrant forfeiture of the existing tenancy. *See Pear v. Davenport*, 67 Mass.App.Ct. 239, 243–45, 853 N.E.2d 206 (2006). That is not to say, however, that any departure whatsoever from lease requirements, no matter how minor and immaterial to the lessor, may be relied upon as a default that defeats the tenant's exercise of an option.

*Id.* The court thus rejected the landlord's position, which demanded "nothing less than perfection" and would allow the landlord to "seize on any number of trivial, technical violations of the lease in order to avoid it." [5] *Id.* at 513. The court contrasted these defaults with "defaults of a significant nature that go to the heart of the parties' agreement, such as the repeated failure to pay rent on time or the failure to exercise the option in the manner prescribed in the lease." *Id.* at 513 n. 4 (internal citations omitted).

While Defendant minimizes *Trinity's* significance, the case is directly on point, and its reasoning makes perfect sense. It would be manifestly unjust for a landlord to be able to induce a tenant into an extended lease agreement with promises to sell the property upon the lease's expiration, and later avoid his obligation by citing any infraction, large or small, by the tenant over a fifteen-year period.[6]

---

**5.** The trial judge provided the following examples of trivial violations that would result in forfeiture of the option under the landlord's theory: failure to clean one of the restaurant's windows, improper disposal of a piece of litter, or an imperfectly sealed food storage container.

*See id.* at 513 n. 4.

**6.** *Trinity* is also consistent with the law of other states. *See, e.g., Cimina v. Bronich*, 517 Pa. 378, 537 A.2d 1355 (1988) (holding that tenant was entitled to specific performance of option to purchase notwithstanding "technical breach" whereby tenant failed to pay real estate taxes but was, at all relevant times, ready, willing, and able to do so); *Panhandle Rehabilitation Ctr. v. Larson*, 205 Neb. 605, 288 N.W.2d 743 (1980) (noting that "a lessee may be precluded from exercising an option to purchase by a substantial breach of the lease terms" and holding that commercial tenant did not commit substantial breach by failing to comply with lease provision requiring that plaintiff include landlord as an additional insured in liability insurance contract and to furnish copy of such contract to defendant); *Advance Components, Inc. v. Goodstein*, 608 S.W.2d 737 (Tex.Civ.App.Ct.1980) (eschewing strict compliance with terms of

Defendant attempts to distinguish *Trinity* by arguing that it involved an option to extend the lease, while this case involves an option to purchase. However, nothing in *Trinity* indicates that the court's decision turned on the fact that the tenant sought to exercise a renewal option rather than a purchase option. Moreover, it may be even less important that a tenant fully comply with all existing covenants when the dispute involves an option to purchase, rather than an option to extend. For instance, the defaults at issue here—subletting the property without prior written consent, making improvements without prior written consent, and violating local ordinances—did not impose any substantial burden on Defendant while Plaintiffs were tenants (as explained below) and would only have created problems for the landlord if Plaintiffs sought to extend the lease rather than purchase the property.

This court, then, is tasked with determining whether the defaults alleged here were "inconsequential and immaterial" or "significant" and "prejudicial." *Trinity*, 931 N.E.2d at 512. In arguing that Plaintiffs' defaults were of the latter variety, Defendant relies on an earlier decision by this court in *Sunoco, Inc. (R & M) v. Makol*, No. 01–30053–MAP, 2002 WL 991703 (D.Mass. May 10, 2002), *aff'd*, 372 F.3d 31 (1st Cir.2004) ("*Sunoco*"). *Sunoco* arose under a remarkably similar set of circumstances. In *Sunoco*, a commercial tenant operating a gas station sought to exercise an option to purchase the property, and the landlord refused, arguing that the tenant had defaulted by subleasing a portion of the property to an owner of a carwash without prior written consent. *Id.* at *1. This court held for the landlord, finding that the tenant had breached the

lease and awarding tenant specific performance of option to purchase despite technical

agreement and must therefore forfeit the option to purchase. *Id.* at *7.

*Sunoco* is easily distinguishable from the present case. First, the tenant's waiver argument in *Sunoco* was considerably weaker, as the landlord in *Sunoco*, unlike Miller, never made an express waiver of rights. In addition, the option to purchase in *Sunoco* included a clause stating that any default by the tenant must be "specifically waived by the seller in writing" as a condition precedent to the exercise of the option. *Id.* at *2. No such clause exists in Plaintiffs' Lease.

Second, the breach at issue there was much more substantial. In *Sunoco* the tenant's failure to obtain the landlord's prior written consent deprived the landlord of significant potential revenue:

> [T]he Lease's requirement that defendants be given advance written notice of a sublease was not merely a technicality. Giving defendants notice of, and an opportunity to reject, a proposed sublease allowed defendants to adjust the lease payments—*i.e.*, to increase the rent in recognition of the sublease. By concealing the sublease plaintiff concealed the true value of the lease.

*Id.* at *6 n. 1. The tenant, Sunoco, received payments from the sublessee totaling approximately $460,000, half of which the jury ultimately awarded to the landlord. *See Sunoco, Inc. (R & M) v. Makol*, 372 F.3d 31, 35 (1st Cir.2004).

Here, however, the record makes plain that Miller clearly expressed his intention to allow Plaintiffs to sublet the Premises without demanding a share himself. The evidence, indeed, indisputably confirms that Miller encouraged Plaintiffs to find a subtenant and never once, based on the

defect in financing the purchase).

facts presently before this court, suggested that he would increase their rent as a result. In fact, Miller was made aware of sublease arrangements on multiple occasions and did not implement a rent hike. Significantly, the sums Plaintiffs received—from every subtenant, including Tri–Lift—were trivial compared to those received under the sublease in *Sunoco*. Regardless of Miller's motivation, though, it is clear that Defendant suffered no prejudice as a result of Plaintiffs' failure to obtain Miller's written consent prior to subletting the Premises. Thus, because the default alleged here was, on the undisputed facts of record, "inconsequential and immaterial," not "significant or prejudicial," *Trinity*, 931 N.E.2d at 512, it cannot, as a matter of law, bar Plaintiffs' exercise of the option.

The same is true of the other defaults alleged by Defendant. Defendant asserts that Plaintiffs also violated the Lease by installing a new heater, a sign, new doors, and a new roof without the landlord's prior written consent. Defendant contends in conclusory fashion that "those alterations will affect the value of the Premises," (Dkt. No. 34, Def.'s Opp'n at 11), but fails to offer any evidence in support of this argument. Indeed, common sense suggests that such alterations would serve to enhance the value of the Premises. In any event, Defendant has shown no prejudice as a result of Plaintiffs' improvements to the property.

Similarly, Defendant asserts numerous violations of municipal ordinances—installing signs without a permit, failing to plant shrubs as a buffer between the pavement and the tree belt, failing to pay excise tax, and falsely applying as the owner of the property to receive permits for alterations—yet fails to demonstrate how these alleged violations caused her or her predecessor-in-interest harm of any kind. It is also unclear which, if any, of these alleged defaults continued through May 28, 2009, thus presenting an independent basis for summary judgment. It is undisputed that only defaults existing at the time of the attempted exercise of the option have the potential to effect a forfeiture.[7] (*See* Dkt. No. 29, Ex. 1, Art. XVII, § 17.01 ("The Tenants shall have an option to purchase the real estate as described in Article 1.01 ... provided that the Tenants shall not *then* be in default in the payment of rent or any of the other terms and condition [*sic* ] hereof.") (emphasis added).)

This case, then, presents exactly the type of situation that *Trinity* helpfully addressed. Defendant does not allege a rent arrearage, nor does she suggest that the attempted exercise of the option was improper or untimely. In truth, the breaches alleged here amount to an attempt to "seize on any number of trivial, technical violations of the lease" in order to avoid Defendant's obligation to sell the property. *Trinity*, 931 N.E.2d at 513. Accordingly, this court finds that because Miller waived his rights under Section 6.01 of the Lease, and because the breaches alleged here were inconsequential and immaterial, Plaintiffs' letter dated May 28, 2009, represented a valid exercise of the option to purchase the Premises. Plaintiffs are thus entitled to specific performance of that option.[8]

---

**7.** In fact, Plaintiff Bachorz testified that the bulk of the improvements occurred "right at the beginning [of the Lease]" and that Plaintiffs had not undertaken any significant improvements in recent years. (Dkt. No. 32, Ex. 3, Bachorz Dep. 100:3–18.) Moreover, Miller's encouragement or, at the least, his failure to object to these improvements at any point makes it clear that he waived his right to object to these alleged defaults as well.

**8.** Given the court's ruling, the court need not and will not address the other arguments

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 26) is hereby DENIED, and Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 31) is hereby ALLOWED. The clerk will schedule a status conference to discuss the issue of damages and any remaining claims.

It is So Ordered.

advanced in Plaintiffs' brief concerning principles of equity and the doctrine of mutually dependent covenants.