# United States Court of Appeals
## For the First Circuit

No. 03-1780

SUNOCO, INC. (R&M),

Plaintiff, Appellant,

v.

NAIF MAKOL, JR., and MAKOL FAMILY LIMITED PARTNERSHIP,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Howard, Circuit Judges.

George J. Krueger with whom John B. Reilly and John Reilly & Associates were on brief for appellant.
Keith A. Minoff with whom Robinson Donovan, P.C. was on brief for appellees.

June 10, 2004

**BOUDIN**, **Chief Judge**.  This is an appeal by the plaintiff appellant, Sunoco, Inc. (R&M) ("Sunoco") from a grant of summary judgment in favor of defendants-appellees, Naif Makol, Jr., and the associated Makol Family Limited Partnership (collectively, "Makol").  The dispute centers on the proper interpretation of a lease agreement governing a gas station and car wash in West Springfield, Massachusetts.  The origin is a set of transactions involving Makol and a third party--F.L. Roberts & Co. ("Roberts").

In the early 1990s, Makol and Roberts owned adjacent parcels of property in West Springfield.  Roberts leased Makol's lot and operated a gas station, convenience store, car wash, and ATM on the joint parcels--it is not entirely clear what was on which lot, but nothing turns on this.  Roberts began renovating the gas station complex in 1993, but encountered problems with West Springfield's complex zoning regulations--specifically, a "mixed ownership" restriction prohibiting any business in the relevant area from being operated on land owned by two different parties.

To solve the zoning problem, Roberts and Makol executed three agreements: a conveyance, a long-term lease, and an option to purchase.  Roberts first conveyed the title to his parcel to Makol for nominal consideration.  Then, on May 5, 1993, Makol leased both parcels back to Roberts for a period of 21 years (the "lease agreement").  On the same day, the parties signed a third document (the "option agreement") giving Roberts the right to purchase both

properties for $1.75 million, provided that he was not in default under the lease agreement and that he informed Makol in writing between March and September 2000.  If Roberts did not exercise the option during that period, his original plot would still revert back to him in 2014, at the end of the 21 year lease--assuming he was not "in default" under the lease agreement.  In 1994, Naif Makol assigned all his interests to Makol Family Limited Partnership.

At the heart of this case is section 10 of the lease agreement, which governs subleases and assignments.  It provides (we underline key language):

(a) Provided that the Lessee is not in default hereunder, <u>the Lessee shall be entitled to assign this Lease or make a sublease for the whole of the Premises as follows. The right to assign or sublease shall be restricted to an assignment or sublease in favor of Sun Company, Inc. (R&M), or another major national oil company (the "Assignee")</u> whereby the Assignee, by written agreement entered into with the Lessor assumes all obligations and liabilities of the Lessee under this Lease. Notwithstanding any such assignment or sublease, the Lessee shall remain additionally liable to perform all of the obligations of the Lessee under this Lease. The Lessee agrees to provide the Lessor with written notice of any such assignment or sublease thirty (30) days in advance of the effective date thereof.

(b) <u>Any attempted assignment or sublease which does not fully comply with Paragraph 10(a) shall be deemed a default hereunder</u>, at the option of the Lessor, and shall be null and void and have no effect with regard to the Lessor.

A month and a half after signing the lease and option agreements, on June 21, 1993, Roberts assigned all of his rights in the premises to Sunoco (we use Sun Company's current name), the company mentioned in the lease. All parties agree this was a valid assignment of the whole premises--proper notice was given to Makol, Sunoco agreed in writing to be directly liable to Makol on all lease obligations, and Roberts still remained liable as well. Roberts also assigned Sunoco the option to purchase the entire property between March and September 2000. Sunoco thus stepped into the shoes of Roberts and became the "lessee" under the lease agreement, consenting to be bound by its terms.

Two days later, on June 23, 1993, Sunoco and Roberts entered into a three-year agreement under which Sunoco would sublease back to Roberts the car wash facility--a portion of the premises Roberts had just assigned to Sunoco. The parties dispute whether Makol knew or should have known of this arrangement, but assuredly Makol did not formally consent to the sublease. Indeed, while all three parties had signed notarized forms consenting to the Roberts-Sunoco assignment two days before, only Roberts and Sunoco were parties to the car wash sublease.

It is also undisputed that the sublease did not comply with the formal procedure for assigning the premises detailed in section 10(a) of the lease agreement. The sublease was not a lease "for the whole of the premises"; it was not to a major national oil

-4-

company; and proper 30-day notice was not given to Makol. The crucial question is whether the car wash sublease was nevertheless permissible under the Makol-Roberts lease agreement. If not, the sublease would not be valid and--more important to the parties--the attempt to sublease would constitute a default under section 10(b), posing a threat to Sunoco's assigned right to purchase under the option contract.

The sublease agreement gave complete control over the car wash facility to Roberts; the contract specified that Sunoco did not have any right "to exercise any control over, or to direct in any respect the management or conduct of [Robert's] car wash business," and it said that Roberts would be responsible for all operating costs, taxes, and insurance. The first three-year sublease was renewed for another three years in 1996, and three more in 1999, on substantially the same terms as the first sublease.

In the summer of 1999, Sunoco submitted a plan for expansion of the gas station complex to the town zoning board, but withdrew the plan in November 1999 after the town's building commissioner suggested that the existing business complex might be in violation of the town zoning ordinances. The main zoning problem seems to have been that the car wash was a "second independent business" leased and operated by a separate company on the same parcel of land as the primary gas station complex. To get

around this problem, Roberts and Sunoco executed a "management agreement" under which Roberts would operate the car wash as an "agent" of Sunoco (although a separate side-letter agreement made clear that nothing about the parties' relationship would actually change). The town's building commissioner dropped the zoning issue, at least temporarily--he later expressed doubts about the legitimacy of the arrangement when he learned about the side-letter agreement.

Several months later, by letter dated November 23, 1999, Makol informed Sunoco that both the car wash sublease and the zoning violations constituted breaches of the lease agreement, and the option to buy the premises was consequently terminated as a result of the defaults. The original lease agreement provided that breach of any of its "provisions, covenants or obligations" would, if not cured within 30 days after notice, constitute a default of the entire lease. The option agreement provided that a breach of any terms of either the lease or option agreement would constitute a default of the option.

Sunoco responded in writing by denying any default, but made no additional effort to cure the alleged zoning violations. Then, in June 2000, Sunoco wrote to Makol attempting to exercise its option under the Makol-Roberts option agreement (assigned by Roberts to Sunoco) to purchase the entire property for $1.75 million. Makol declined to proceed with the sale. In March 2001,

Sunoco brought this diversity suit in federal court seeking declaratory and injunctive relief requiring Makol to convey the premises to Sunoco under the terms of the option agreement. Makol counterclaimed, requesting damages for Sunoco's breach of contract and arguing that Sunoco had committed unfair acts or practices in violation of Mass. Gen. Laws ch. 93A.

The district court rejected Makol's 93A claim but granted summary judgment to Makol on the breach of contract issue, ruling that the undisputed evidence established that Sunoco breached the lease agreement by entering into a car wash sublease with Roberts. Since the lease was breached, Sunoco lost the option to purchase both properties, and the only remaining question was the damage caused to Makol by Sunoco's prohibited sublease to Roberts. The parties presented this damages issue to a jury, which awarded $231,000 to Makol--a sum that represented half of all money that Sunoco had received from Roberts under the car wash sublease.

Sunoco now appeals, raising numerous objections to the district court's interpretation of the lease agreement as well as objections to the damages award. The damages issue depends on whether there was evidence sufficient to permit a rational jury to make the award and raises a related issue of admissibility of evidence. We begin with the central contractual interpretation question. Our review of the summary judgment ruling in favor of

Makol is <u>de novo</u>.  <u>Rankin</u> v. <u>Allstate Ins. Co.</u>, 336 F.3d 8, 11 (1st Cir. 2003).

The most straightforward reading of section 10 readily supports a grant of summary judgment against Sunoco.  Subsection (a) permits the Lessee to "make a sublease for the whole of the Premises" on certain conditions.  Subsection (b) bars "[a]ny . . . sublease which does not fully comply" with subsection (a).  Sunoco (after assuming the lease) unquestionably subleased the car wash premises back to Roberts, and that sublease unquestionably does not comply with the provisions of subsection (a).  On this reading, Sunoco violated a lease obligation it had assumed and so lost its option rights under the explicit terms of the option agreement.

Sunoco's main answer is that subsection (b)'s general language--"[a]ny attempted assignment or sublease"--should be read narrowly as a reference back to the supposed subject of subsection (a), namely, an assignment or sublease of "the whole of the Premises."  So limited, subsection (b) would not address leases of less than the whole of the premises; and, as the sublease of the car wash was of less than the whole premises, subsection (b) would be irrelevant.  Sunoco supports the argument by citing cases in Massachusetts and elsewhere that encourage a narrow reading of lease terms that restrict subleasing.

Sunoco's reading is strained as a matter of language and highly improbable from the standpoint of likely intent.  The

-8-

language of subsection (a) confers permission on the holder of the lease to assign the lease or to sublease the entire premises under certain conditions.  Read literally, subsection (b) bars "any" other sublease--not just subleases of the entire premises that are to someone other than a major oil company, that fail the assignment condition, or that lack required notice.  Thus, on a straightforward reading, every sublease not specifically permitted by (a) is barred by (b)--and the sublease back to Roberts was not specifically permitted by (a).

Further, the "entire premises" language of subsection (a) bespeaks a purpose to keep the property in the hands of a single lessee--an objective that fits with the "mixed ownership" zoning problem that had led to the original dispute with the city. Further, in the district court's words, Sunoco's reading seemingly would produce "an absurd result:  so long as plaintiff retained some fractional interest (even one percent) in the premises, the Lease would not be violated by a sublease. Under plaintiff's reasoning, the Lease would not have been violated, for example, if the gas station, convenience store, car wash, ATM machine, and all but one parking space had been subleased to a party or parties unaffiliated with a 'major national oil company.'"

Massachusetts cases support a narrow reading of clauses limiting subleasing, e.g., O'Keefe v. Kennedy, 57 Mass. 325, 327 (1849), but do not endorse one that deviates markedly from language

-9-

and appears improbable. For example, in <u>Marcelle, Inc.</u> v. <u>Sol. &</u> <u>S. Marcus Co.</u>, 175 N.E. 83, 84-85 (Mass. 1931), the Supreme Judicial Court evaluated a lease contract that prohibited assignments but was silent as to subleases. The court concluded that the prohibition on assignment, "read in the light of the circumstances of the parties and the main purpose to be accomplished," should be interpreted as prohibiting both assignments and subleases. <u>Id.</u> at 85.

Cases from a few other jurisdictions may go slightly further, perhaps narrowly construing prohibitions on subleasing so as to permit a sublease of part of the premises. <u>See</u> <u>Denecke</u> v. <u>Henry F. Miller & Son</u>, 119 N.W. 380, 384 (Iowa 1909); <u>Spencer</u> v. <u>Commercial Co.</u>, 71 P. 53, 54 (Wash. 1902). But even these cases are not directly in point. Section 10 does not bar subleasing in subsection (b). It defines (in subsection (a)) a specific permitted sublease "for the whole" and then bars <u>any</u> other sublease.

Sunoco has one fall-back argument worth discussing in detail. In the spring of 1993 while the original transactions were being framed, Roberts discussed with Makol the possible assignment to Sunoco; this is obvious not only from depositions but from section 10's reference to Sunoco as a specifically approved assignee, subject to named conditions. But Sunoco <u>also</u> claims that Makol was advised that--once Sunoco leased the whole premises from

Roberts--Sunoco proposed as well to sublease back the car wash portion to Roberts so he could go on operating that portion of his former business.

Whether extrinsic evidence can be considered at all depends both on canons of contract construction and on the related substantive "parol evidence" rule.[1] But we need not pursue these legal issues because, even if the extrinsic evidence were considered, it is clear it would not alter the result. What Sunoco's evidence shows at best is that Makol _may_ have been told of the planned lease-back (Makol flatly denies this) but _not_ that he consented to it.

The only directly pertinent deposition testimony came from Joseph Maggi, one of Roberts' employees responsible for negotiating the original lease with Makol. In response to questions from Makol's lawyer, Maggi said that he told Makol that--assuming an assignment or lease of the property to Sunoco--Roberts was "going to continue to operate the car wash" and that Roberts was "going to sell and lease back certain facilities." Against this background, Makol's lawyer asked Maggi:

---

[1]Massachusetts courts commonly say that extrinsic evidence is admissible to resolve ambiguity, but not to contradict plain language. See Robert Indus., Inc. v. Spencer, 291 N.E.2d 407, 409 (Mass. 1973). The related (and easily confused) parol evidence rule limits proof of a supposed oral agreement prior to or contemporaneous with a written contract depending on how fully the written document is "integrated." See Restatement (Second) of Contracts § 213 (1981).

-11-

Q. Was there ever any discussion between the parties in which this issue was discussed, that is, if we do this Car Wash lease, between us, is this going to perhaps violate section 10 of the lease?

A. I would --

Q. Were you ever part of any discussion on that?

A. No, I would put it a little differently. It was in preparation of [Paragraph] ten that the contemplation of the Car Wash Lease and the reason for the use of the word whole.

Q. You mean the Car Wash Lease between Roberts and Sunoco was already contemplated when paragraph 10 was drafted?

A. Oh, sure.

Q. Well, if that's the case, why wasn't the Car Wash Lease specifically identified as an approved sublease?

[Objection]

That the parties shall be permitted to enter into a Car Wash Lease, notwithstanding these provisions?

[Objection]

A. It wasn't necessary based on this just as the sublease with what was then BayBank or Bank of New England or whoever they were at the time, it wasn't contemplated that those needed permission of the lessor either.

There are three different facets to this deposition testimony. The first--the claim that Makol was told that a lease back to Roberts was contemplated--is a factual proposition. Although denied by Makol, we accept the proposition as true for

-12-

purposes of summary judgment on the ground that a jury might believe the testimony of Maggi. <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-50 (1986). Yet this proposition does not show that Makol <u>consented</u> to such a sublease or agreed it could be done under section 10 without further permission from Makol. Makol's silence might at best be used for an estoppel argument--which Sunoco may hint at but does not develop.

The second facet of the testimony quoted above is quite different. In substance, Maggi offers a construction of section 10 fully consistent with what Sunoco urges in this case--that it dealt only with leases of the entire property--but Maggi provides no <u>facts</u> showing that Makol or even Roberts endorsed that interpretation at the time. The passive phrase "it wasn't contemplated" may be intended to assert that Makol so understood section 10; but if so read, it is merely a naked and conclusory assertion which is entitled to no weight. <u>See</u> <u>Fleet Nat'l Bank</u> v. <u>H&D Entm't, Inc.</u>, 96 F.3d 532, 540 (1st Cir. 1996); <u>Favorito</u> v. <u>Pannell</u>, 27 F.3d 716, 721-22 (1st Cir. 1994).

Finally, Maggi's testimony refers to the fact that a bank had earlier subleased a small portion of the premises for an ATM machine, and yet there was no reference in section 10 or elsewhere to the continuation of this sublease. But whatever mild inference[2]

---

[2] The bank lease predated the Makol-Roberts arrangements by 13 years. The original lease to Roberts was thus subject to that sublease and would not have been impacted by section 10 at the

-13-

might be drawn in Sunoco's favor is easily offset by another lease transaction; later on, Makol's express consent (in exchange for a share of the proceeds) was in fact sought when Sunoco aimed to sublease a portion of the premises to a third party for use as parking spaces (as discussed more fully below).

Sunoco offers on appeal a number of other arguments against the district court's summary judgment determination--that Makol did not offer the required period to cure the default, that restrictions on subleases do not apply to leases back to the original lessee, and that equitable relief should have been granted to prevent a windfall or forfeiture. These arguments were not adequately made in opposition to summary judgment--it is not enough to record facts from which an argument might be made,[3] United States v. Slade, 980 F.2d 27, 30-31 (1st Cir. 1992)--and there is nothing close to plain error. Compare Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc).

This brings us to Sunoco's appeal from the award of damages. In substance, the jury awarded Makol half of the amount of rent that Roberts had paid to Sunoco from the time of the car wash sublease in 1993 to the date of trial. The jury's underlying

_____

outset at all.

[3]Sunoco came closest by including in its opposition to summary judgment in the district court that Makol's claim would give him "a significant, unjust windfall." But the cases cited and the more impressive effort to develop a forfeiture claim on appeal come too late.

-14-

premise was likely that Makol would have imposed such a toll if Sunoco had sought permission to sublease the car wash back to Roberts. The jury was probably led to this premise by evidence offered by Makol at trial of a failed negotiation over the possible sublease of parking spaces. The evidence, received over Sunoco's objection, was as follows.

In September 1994, a local restaurant owner, Ronald Abdow, asked Sunoco if he could sublease some parking spaces. They worked out a deal to rent Abdow ten spaces for $300 a month, and Sunoco drafted a lease agreement and sent it (unsigned) to Abdow for his signature. The draft agreement said that it was "entered into by both parties with expressed approval of Mr. Naif Makol for which he will receive one half (1/2) of the monthly consideration" and that the payments to Makol "shall not be deemed as setting precedent." Abdow signed the lease and returned it, but Sunoco then told Abdow the deal was off for "corporate reasons."

In the trial on damages, Sunoco filed a motion in limine to exclude all evidence relating to the parking sublease, arguing that this evidence would be extremely prejudicial and was not probative given the disclaimer about precedent, the fact that the contract was never signed by the Sunoco board, and the disparity in price and subject matter between the parking and car wash subleases. The district court rejected this motion, finding that

the evidence was "sufficiently relevant, and I think when presented in the context is not unfairly prejudicial."

The capacity of the parking space draft agreement to mislead is obvious: splitting a small payment ($300 per month) for unused parking spaces is one thing; extrapolating to half of the rent paid by a substantial business (around $3500 a month) is quite another. On the other hand, there is not a lot of reliable evidence as to what Makol might have charged, and Sunoco paid, for waiver of section 10 rights so as to permit the car wash sublease. Sunoco was free to argue to the jury (and did so argue) that the parking space draft should be given little weight.

To admit or exclude such evidence is precisely the kind of judgment, balancing limited relevance against arguable prejudice, that is reviewed only for abuse of discretion. McMillan v. Mass. Soc. for Prevention of Cruelty to Animals, 140 F.3d 288, 300 (1st Cir. 1998), cert. denied, 525 U.S. 1104 (1999). The district court's call was within the range of reasonableness. The fact that Sunoco's draft said it was not precedent does not prevent Makol from using it for whatever it was worth, and if the unexplained rejection by Sunoco's board bore on the weight to accord the draft, Sunoco was free to explain the reasons.

With this evidence properly admitted, there was (contrary to Sunoco's next argument) enough evidence to support the jury's award of damages to Makol. True, the jury could not have been

certain exactly what percent of rent Makol would have demanded, but it knew how much the car wash sublease was worth and that on a past occasion Makol had demanded 50 percent of the profits from a sublease. Makol testified that he would have demanded the same 50-50 split for a car wash lease, and that this type of split was "customary in real estate dealings of this nature." This is enough for a reasonable approximation, especially because the lack of actual negotiations is due to Sunoco's own breach.[4]

Finally, Sunoco asserts briefly that even though the lease agreement provides that Makol is entitled to attorney's fees necessary to "enforce" its rights under the contract, all of the attorney's fees awarded by the district court should be vacated since Makol's enforcement action was "pretextual." This argument is hardly promising but in any event it is not seriously developed--not a single citation to either relevant law or the record is provided--and is therefore waived. Mass. Sch. of Law at Andover v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).

Affirmed.

---

[4]Fiori v. Truck Drivers, Local 170, 354 F.3d 84, 88 (1st Cir. 2004); Nat'l Merch. Corp. v. Leyden, 348 N.E.2d 771, 774 (Mass. 1976); Air Tech. Corp. v. Gen. Elec. Co., 199 N.E.2d 538, 548 (1964).