# United States Court of Appeals
## For the First Circuit

No. 12-1187

GARY J. BACHORZ; CARMELO A. SCUDERI,

Plaintiffs, Appellees,

v.

SHAUNICE MILLER-FORSLUND,
Executrix of the Estate of Nairn L. Miller,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Howard, Ripple,[*] and Selya,
Circuit Judges.

James Kossuth, with whom David H. Rich was on brief, for appellant.
Mark J. Albano for appellees.

December 26, 2012

---

[*] Of the Seventh Circuit, sitting by designation.

**RIPPLE**, **Circuit Judge**.     In February 1996, Mr. Gary Bachorz and Mr. Carmelo Scuderi (the "plaintiffs") entered into a fifteen-year lease, which included a purchase option, with Mr. Nairn Miller.  The plaintiffs instituted this action against Miller's successor in interest,[1] Ms. Shauna Miller-Forslund, when she refused to allow the plaintiffs to exercise the purchase option on the ground that they were in default on their obligations under the lease.  The district court granted summary judgment in favor of the plaintiffs and ordered specific performance of the purchase option.[2]  It determined that Miller had waived a provision which prohibited the plaintiffs from subleasing without prior written permission and that all alleged defaults were "inconsequential and immaterial."  Bachorz v. Miller-Forslund, 812 F. Supp. 2d 83, 94 (D. Mass. 2011).

Ms. Miller-Forslund appeals.  She contends that there was no waiver, that the plaintiffs were in material breach and that their attempt to exercise the option was therefore invalid.  We conclude that the district court was correct and affirm its judgment.[3]

---

[1]  Mr. Miller died in January 2007.

[2]  The district court's jurisdiction was predicated on 28 U.S.C. § 1332.  The plaintiffs are citizens of Massachusetts and Mr. Miller was a citizen of either Idaho or Florida when he died.

[3]  Our jurisdiction is predicated on 28 U.S.C. § 1291.

# I

# BACKGROUND

## A. Facts

The plaintiffs are the owners and operators of Berkshire Auto & Truck, Inc. ("Berkshire Auto"), an auto-repair business, which they started in 1985. In 1995 or early 1996, the plaintiffs approached Miller about the possibility of purchasing his property located at 850 Berkshire Avenue (the "premises") for Berkshire Auto's new location. Miller was amenable to the sale, but wanted to avoid paying capital gains tax on the property. The parties therefore settled on a fifteen-year lease with a purchase option. The lease was executed on February 12, 1996, and began on March 1, 1996. The purchase option, contained in Article XVII, subsection 17.01, is as follows:

> The Tenants shall have an option to purchase the [premises] for the sum of One Hundred Seventy-Five Thousand ($175,000.00) Dollars to be exercised during the term of this lease by instrument in writing directed to the Landlord at its designated address provided that the Tenants shall not then be in default in the payment of rent or any of the other terms and conditions hereof.[4]

Article IV, subsection 4.03 allowed the plaintiffs to make alterations or improvements with Miller's written consent. Under Article VI, subsection 6.01, prior written consent also was required for any sublease or assignment. However, any sublease or

---

[4] R.29-1 at 7.

assignment would not alter the overall rental obligation of the plaintiffs under the lease.[5] Article VII, subsection 7.02 required the plaintiffs to "comply with all of the requirements of all county, municipal, state, federal and other applicable governmental authorities" and "faithfully observe in the use of the premises all municipal and county ordinances and state and federal statutes."[6] Article XIV, subsection 14.01 provided that waiver of any breach, covenant or condition, or acceptance of rent subsequent to a breach, was not a waiver of the lease term and that any waiver had to be in writing. Subsection 14.03 required any amendment to the agreement to be in writing.

Miller's duties under the agreement included a provision in Article IV, subsection 4.04 that he "warrant[] the good condition and repair of the roof of the premises for a period of ten (10) years . . . and agree[] to be responsible for any necessary repairs thereto."[7] The plaintiffs specifically requested this provision because an inspection had revealed that "the roof

---

[5] Article II, subsection 2.01 provided for reduced payments during the first six months, creating an "unpaid rent" deficit. The lease further provided that this "unpaid rent" would be satisfied by increased payments for the following three years. Any rent received from sublessees during those three years was to be applied to accelerate the payment of this "unpaid rent." Id. at 1.

[6] Id. at 3.

[7] Id. at 2.

4

had several issues" and "needed work."[8] Mr. Bachorz testified that he may not have entered into the lease had Miller not agreed to warrant the good condition of the roof. Mr. Bachorz believed that, in ten years, Berkshire Auto would be financially able to take over responsibilities for the roof.

The plaintiffs leased the premises in their own name and immediately began subleasing it to Berkshire Auto, although the record does not indicate whether this arrangement included a formal written sublease. The lease did not provide explicitly that the plaintiffs would sublease the premises to Berkshire Auto, and the plaintiffs did not obtain written permission for that arrangement. Miller himself also continued to maintain an office on the premises until 2002; however, the lease contained no provision contemplating that Miller would continue to occupy part of the premises.[9]

Mr. Bachorz testified that, after signing the lease, Miller encouraged the plaintiffs to find subtenants to assist in paying rent and thus utilize the entire building. At some point between 1996 and early 2002, the plaintiffs allowed an individual to operate a discount dog food business on the premises in exchange

---

[8]  R.32-3 at 5, 23.

[9]  Ms. Miller-Forslund suggests that the lease provided for Miller's continued presence on the property. Appellant's Br. 22-23. The most colorable mention of a sublease to Miller in the lease is a provision that reads: "Each such monthly payment shall be payable on or before the first day of each month, in advance, at the office of the Landlord or at such other place designated by Landlord." R.29-1 at 1.

5

for a portion of his sales revenue. In February 2002, the plaintiffs allowed another business, Berkshire RV Rentals, to operate on the premises without paying rent. Mr. Bachorz testified that, although he did not obtain express oral or written consent to sublet to the dog food business, Miller knew about the arrangement because he walked past displays of dog food every day when he came to his office on the premises. Mr. Bachorz testified that, when he approached Miller about subletting to Berkshire RV Rentals in early 2002, Miller said it was a "good idea" and agreed to vacate his office to make room for the new subtenant.[10] Berkshire RV Rentals occupied space on the premises for three or four months. From February 2006 until at least the date of the district court's ruling in September 2011, the plaintiffs sublet two offices on the premises to Tri-Lift, a forklift company, for $500 per month. As with the other subtenants, there was no written lease, just a month-to-month oral agreement. The parties agree that the plaintiffs did not notify or obtain permission from Miller or Ms. Miller-Forslund prior to subleasing to Tri-Lift.

The roof of the premises leaked at least once every year from the commencement of the lease until 2002. Mr. Bachorz testified that the leaky roof caused property damage including a shorted-out radio and alarm system, and the plaintiffs had to hang plastic from the ceiling to channel the incoming water. In May

---

[10] R.32-3 at 8-9.

2002, the plaintiffs' attorney notified Miller in writing that the roof was leaking yet again, had caused property damage and was sagging. A professional estimated that it would cost over $15,000 to repair the roof properly. The letter noted that Miller's prior attempts to repair the roof had failed and demanded that he comply with the lease term requiring him to repair it properly. Miller responded by letter saying that replacing the roof was not an option. He stated that the plaintiffs owed him $90 in late fees and, in a post-script, noted that the plaintiffs were in default for subletting a portion of the premises without prior written consent. Mr. Bachorz testified that, when he spoke with Miller after the letter exchange, Miller said that he would not pay for a new roof and told the plaintiffs, "'You guys should pay for the roof because you're going to own the building.'"[11] In response to interrogatories, the plaintiffs stated that Miller agreed to waive any default as to subtenants. "He said . . . words to the effect that 'The place will be yours soon. I don't want to pay anything else for maintenance. If you pay for the roof, I will not raise any issue about present [or] future subtenants.'"[12] In their depositions, both plaintiffs also testified that Miller told them that, if they paid for the roof, he would not worry about the lack of prior written consent for the subtenants. Mr. Bachorz

---

[11]  Id. at 24.

[12]  R.32-5 at 2.

specifically testified that this oral agreement included past and future subtenants. The plaintiffs replaced the roof at their own expense in 2004; Mr. Bachorz testified that the delay was "probably" because they could not afford the repair in 2002.[13] In addition to replacing the roof, the plaintiffs made other changes to the property over the course of the lease; Mr. Bachorz testified that Miller verbally approved their efforts and told them that they were "doing a good job."[14]

Mr. Miller died on January 17, 2007, and his daughter, Shaunice Miller-Forslund, became executrix of his estate. On April 29, 2009, Ms. Miller-Forslund's attorney sent a letter informing the plaintiffs that they were in default for failing to pay late fees, subleasing the premises without prior written consent and failing to resubmit rental payments when two checks designated as "mortgage" were refused. The letter stated that these defaults precluded the plaintiffs from exercising the purchase option. On May 28, 2009, the plaintiffs sent Ms. Miller-Forslund a written notice of their intent to exercise the option. When Ms. Miller-Forslund refused to sell, the plaintiffs sued, demanding specific performance or damages of $550,000 plus costs and fees.

---

[13] R.32-3 at 13.

[14] Id. at 26.

**B.  District Court Proceedings**

During proceedings in the district court, Ms. Miller-Forslund alleged that the plaintiffs were in violation of various lease terms, including making improvements without prior written consent, subleasing without written permission and violating municipal ordinances. The district court nevertheless granted the plaintiffs' request for specific performance, determining that the May 2009 letter was a valid exercise of the option because any breach of the sublease provision had been waived by Miller during the roof replacement negotiations, and in any event, all defaults cited by Ms. Miller-Forslund were "inconsequential and immaterial." Bachorz, 812 F. Supp. 2d at 94.

**II**

**DISCUSSION**

**A.**

We first address whether Miller waived the requirement that the plaintiffs obtain written permission before subleasing any portion of the premises. Ms. Miller-Forslund maintains that there was no waiver because the agreement required all waivers to be in writing, and the record does not show conclusively that Miller waived the requirement through his words or actions.

We begin our evaluation of these arguments with an examination of the relevant general principles related to waiver

9

and modification.[15]  Whether a party has waived a right under a contract is usually a question of fact, but the issue may be resolved on summary judgment when "the evidence is clear, unequivocal and undisputed."  Metro. Transit Auth. v. Ry. Exp. Agency, Inc., 84 N.E.2d 26, 28 (Mass. 1949); see also Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Waiver of a contractual right "may occur by an express and affirmative act, or may be inferred by a party's conduct, where the conduct is 'consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible.'" KACT, Inc. v. Rubin, 819 N.E.2d 610, 616 (Mass. App. Ct. 2004) (alterations in original) (quoting Attorney Gen. v. Indus. Nat'l Bank of R.I., 404 N.E.2d 1215, 1218 n.4 (Mass. 1980)); see also Dynamic Mach. Works, Inc. v. Mach. & Elec. Consultants, Inc., 831 N.E.2d 875, 880 (Mass. 2005) (noting that waiver may be express or "inferred from a party's conduct and the surrounding circumstances" (internal quotation marks omitted)).  If waiver is to be inferred from a party's conduct, the conduct at issue must be "clear, decisive and unequivocal."  Glynn v. City of Gloucester, 401 N.E.2d 886, 892

---

[15]  The parties are in agreement that the law of Massachusetts controls the merits of their dispute.

(Mass. App. Ct. 1980); see also Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 992 (1st Cir. 1988). The waiver must be clear, particularly when it involves a condition for exercising an option contained in a lease agreement. Massachusetts law takes a strict view of options. "[A] waiver of the conditions with respect to the tenancy will not be a waiver of the conditions for the option unless the lessor makes a separate waiver of those conditions." Pear v. Davenport, 853 N.E.2d 206, 209 (Mass. App. Ct. 2006). Thus, a landlord who by his conduct waives a provision requiring the timely payment of rent, does not waive necessarily that requirement for purposes of a provision requiring compliance with lease terms as a precondition to the exercise of an option. See id. at 210.

As to a writing requirement, a contractual provision requiring modifications or waivers to be in writing does not prevent the parties from making such changes orally or through their conduct. Indeed, it is well settled Massachusetts law that parties, through their words or conduct, may modify a contract despite a provision requiring modifications to be in writing. See Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1022 (Mass. 1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract. Mutual agreement on modification of the requirement of a writing may . . . be inferred from the conduct

11

of the parties and from the attendant circumstances of the instant case." (second alteration in original) (internal quotation marks omitted)); First Pa. Mortg. Trust v. Dorchester Sav. Bank, 481 N.E.2d 1132, 1138-39 (Mass. 1985) (holding that the "clear terms" of the original agreement requiring written consent for modification did not nullify a subsequent oral modification). Parties may waive orally provisions requiring modifications to be in writing. See, e.g., Parks v. Johnson, 703 N.E.2d 728, 728-29 (Mass. App. Ct. 1998) (holding that a party to a construction contract impliedly waived, through words and conduct, a provision requiring changes to be in writing). Parties also may waive orally a provision requiring all waivers to be in writing. See Clifford Shoe Co. v. United Shoe Mach. Corp., 8 N.E.2d 161, 167 (Mass. 1937) (noting that a "clause in the lease requiring waiver of any provisions to be in writing . . . may be modified orally").[16]

Applying these principles to the present case, we agree that the record supports the district court's determination that clear, decisive conduct and statements establish that Miller effectively waived the provision requiring the plaintiffs to obtain

---

[16]  See also 13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 39:36 (4th ed. 2000) ("[T]he nonwaiver clause itself, like any other term of the contract, is subject to waiver by agreement or conduct during performance."); 8 Catherine M.A. McCauliff, Corbin on Contracts § 40.13 (Joseph M. Perillo, ed., revised ed. 1999) ("[A]n express provision in a written contract that no rescission or variation is valid unless it too is in writing will not invalidate a subsequent oral agreement to the contrary.").

12

written consent before subleasing the premises. It is undisputed that, in May 2002, the plaintiffs retained an attorney to send Miller written notice that he was in breach of his agreement to maintain the roof in good condition and be responsible for any repairs. Miller responded by having his attorney send the plaintiffs written notice disputing their allegations and alleging that the plaintiffs were in breach of lease terms including the requirement that they obtain Miller's written consent before subleasing the premises. The record indicates that the parties met informally to discuss their relative positions, and Miller told the plaintiffs that, if they would pay to replace the roof (thus releasing Miller from his contractual obligation under Article IV, subsection 4.04), he would not seek to enforce the provision requiring prior written permission for subtenants, whether past or future (thus releasing the plaintiffs from their obligation under Article VI, subsection 6.01). During this discussion, Miller explained that he did not want to invest in a new roof because the plaintiffs would be the eventual owners of the property. In response to interrogatories, the plaintiffs indicated that Miller said "words to the effect that 'The place will be yours soon. I don't want to pay anything else for maintenance. If you pay for the roof, I will not raise any issue about present [or] future

13

subtenants.'"[17]  After this conversation there were no further disputes about subtenants or the leaky roof, and the plaintiffs replaced the roof at their own expense in 2004 at a cost of $22,400.

The parties' words and conduct clearly evince a mutual agreement to waive permanently the provisions related to roof maintenance and subtenants.  The only evidence in the record shows that Miller said that he would waive the provision for future subtenants if the plaintiffs accepted responsibility for the roof. The plaintiffs' decision to replace the roof at their own considerable expense "is consistent with and indicative of," KACT, 819 N.E.2d at 616, their acceptance of Miller's proposal.  That the waiver applied to the purchase option is also clear from the context of the conversation--Miller wanted to be excused from his responsibility to maintain the roof because he expected the plaintiffs to exercise the option.  This "clear, decisive and unequivocal" waiver released the plaintiffs from any obligation to obtain Miller's prior written permission and failure to obtain permission was not a breach.[18]

---

[17]  R.32-5 at 2.

[18]  Our decision in Sunoco, Inc. v. Makol, 372 F.3d 31 (1st Cir. 2004), is not contrary.  Sunoco involved a tenant who breached an assignment clause.  According to the record, absent that breach, the clause may have resulted in the lessor receiving a significant portion of the rent paid by the subtenant.  Id. at 38-39.  Unlike the present case, there was no evidence that the landlord waived

(continued...)

14

Ms. Miller-Forslund does not offer any contrary evidence but instead argues that we should disregard the plaintiffs' testimony because it conflicts with the complaint's allegation that the plaintiffs decided to replace the roof due to Miller's breach and with the complaint's request for reimbursement for the cost of the roof.[19] The testimony and complaint do not conflict. The evidence shows that the alleged breach of Miller's obligation to maintain the roof in good condition prompted the plaintiffs to confront Miller, which in turn led to the oral agreement and the plaintiffs' decision to replace the roof at their own considerable expense. It is not surprising that the plaintiffs did not include all these details in the complaint because a "short and plain statement" is all that the rules require. Fed. R. Civ. P. 8(a). In addition, the request for reimbursement for replacing the roof is best read as an alternative theory for relief in the event that the court denied specific performance, and is entirely permissible under Rule 8(d).[20] See Rodriguez-Suris v. Montesinos, 123 F.3d 10, 20 (1st Cir. 1997). Because the uncontradicted evidence shows that

---

[18] (...continued)
the provision, id. at 36, and we were not asked to determine whether the breach was material or insignificant.

[19] Appellant's Br. 18.

[20] We note that the district court's purchase price calculation did not credit the plaintiffs for having paid to replace the roof. See Bachorz v. Miller-Forslund, 840 F. Supp. 2d 419 (D. Mass. 2012); Bachorz v. Miller-Forslund, No. 3:09-cv-30132-MAP (D. Mass. Dec. 6, 2011).

15

Miller agreed to waive forever the provision requiring the plaintiffs to obtain written permission prior to subleasing the premises, the plaintiffs' failure to obtain permission was not a breach of the lease agreement and did not prevent the valid exercise of the option to purchase.

**B.**

Ms. Miller-Forslund additionally argues that the plaintiffs breached Article VII, subsection 7.02, which requires them to comply with state and municipal laws.[21] She contends that the plaintiffs breached the provision by violating municipal ordinances in the following ways: performing work without a permit, failing to plant shrubs as a buffer between pavement and a tree belt, failing to pay excise tax and applying for a permit as property owners even though they were only tenants.[22] She contends that compliance with these municipal ordinances "'go[es] to the

---

[21] Ms. Miller-Forslund also alludes to back rent or late-payment fees. The district court did not consider the issue of back rent or late payments because Ms. Miller-Forslund did not address these alleged defaults in her summary judgment brief. Bachorz, 812 F. Supp. 2d at 87 n.4. Examination of that document supports the district court's decision.

[22] Appellant's Br. 9, 33. Ms. Miller-Forslund argued to the district court that the plaintiffs were in breach for making improvements to the property without written permission; her brief on appeal notes this fact, but does not argue that it precludes exercise of the option.

16

heart of the parties' agreement.'"[23]

The district court noted that Ms. Miller-Forslund had failed to present evidence of how the alleged violations harmed her or Miller and held that she was attempting to seize on trivial violations in order to avoid her obligation to sell the property.[24] We agree with the district court.

Massachusetts takes a strict view of options. <u>Trinity Realty I, LLC</u> v. <u>Chazumba, LLC</u>, 931 N.E.2d 510, 512 (Mass. App. Ct. 2010). However, it also recognizes that a party's substantial compliance may be sufficient, <u>as a matter of law</u>, to maintain its right to exercise an option. <u>Id.</u> Thus, "minor," "immaterial" or "inconsequential" breaches, which do not prejudice the lessor, will not prevent a lessee from exercising an option. <u>Id.</u> Otherwise, an "option would be virtually meaningless, as [the lessor] could seize on any number of trivial, technical violations of the lease in order to avoid it." <u>Id.</u> at 513.

Here, there is no evidence suggesting that the alleged violations of municipal ordinances prejudiced Ms. Miller-Forslund or her predecessor, significantly affected her rights under the contract or otherwise went "to the heart of the parties' agreement." <u>Id.</u> at 513 n.4. The district court noted that

---

[23] <u>Id.</u> at 33 (quoting <u>Trinity Realty I, LLC</u> v. <u>Chazumba, LLC</u>, 931 N.E.2d 510, 513 n.4 (Mass. App. Ct. 2010)).

[24] <u>See</u> <u>Bachorz</u>, 812 F. Supp. 2d at 94.

17

Ms. Miller-Forslund did not say how the alleged violations caused any harm to her or her predecessor in interest and she does not argue otherwise on appeal.[25]  Without any evidence suggesting that the municipal violations were "significant or prejudicial" or went "to the heart" of the lease agreement, id. at 512, 513 n.4, summary judgment in favor of the plaintiffs was entirely proper.

### Conclusion

For the foregoing reasons, we affirm the district court's order of specific performance of the purchase option.

**AFFIRMED**

---

[25]  When confronted during oral argument, counsel acknowledged that the municipal ordinance violations were "perhaps" trivial defaults.